(CONSTITUTIONAL LAW.)

## STURGES v. CROWNINSHIELD.

Since the adoption of the constitution of the United States, a State has authority to pass a bankrupt law, provided such law does not impair the obligation of contracts, within the meaning of the constitution, art. 1. s. 10. and provided there be no act of Congress in force to establish a uniform system of bankruptcy, conflicting with such law.

The act of the legislature of the State of New-York, passed on the 3d of April, 1811, (which not only liberates the person of the debtor, but discharges him from all liability for any debt contracted previous to his discharge, on his surrendering his property in the manner it prescribes,) so far as it attempts to discharge the contract, is a law impairing the obligation of contracts within the meaning of the constitution of the United States, and is not a good plea in bar of an action brought upon such contract.

THIS was an action of assumpsit brought in the Circuit Court of Massachusetts, against the defendant, as the maker of two promissory notes, both dated at New-York, on the 22d of March, 1811, for the sum of 771 dollars and 86 cents each, and payable to the plaintiff, one on the 1st of August, and the other on the 15th of August, 1811. The defendant pleaded his discharge under " An act for the benefit of insolvent debtors and their creditors," passed by the legislature of New-York, the 3d day of April, 1811. After stating the provisions of the said act, the defendant's plea averred his compliance with them, and that he was discharged, and a certificate given to him the fifteenth day of February, 1812.

To this plea there was a general demurrer and join-<br>
der. At the October term of the Circuit Court,<br>
1817, the cause came on to be argued and heard on<br>
the said demurrer, and the following questions arose,<br>
to wit:

1. Whether, since the adoption of the constitution<br>
of the United States, any State has authority to pass<br>
a bankrupt law, or whether the power is exclusively<br>
vested in the Congress of the United States?

2. Whether the Act of New-York, passed the<br>
third day of April, 1811, and stated in the plea in<br>
this case, is a bankrupt act, within the meaning of<br>
the constitution of the United States?

3. Whether the act aforesaid is an act or law im-<br>
pairing the obligation of contracts, within the mean-<br>
ing of the constitution of the United States?

4. Whether the plea is a good and sufficient bar of<br>
the plaintiff's action.

And after hearing counsel upon the questions, the<br>
judges of the Circuit Court were opposed in opinion<br>
thereupon; and upon motion of the plaintiff's coun-<br>
sel, the questions were certified to the Supreme Court,<br>
for their final decision.

Mr. *Daggett*, for the plaintiff, argued, 1. That<br>
since the adoption of the constitution, no State has<br>
authority to pass a bankrupt law, but that the power<br>
is exclusively vested in Congress. The 8th section of<br>
the 1st article of the constitution is wholly employed<br>
in giving powers to Congress. Those powers had<br>
hitherto been in the State Legislatures or in the peo-<br>
ple. The people now thought fit to vest them in Con-

1819.

Sturges<br>
v.<br>
Crownin-<br>
shield.

*Feb. 8th.*

gress. The effect of thus giving them to Congress may be fairly inferred from the language of the 10th article of the amendments to the constitution, which declares, that " the powers, not delegated to the United States by the constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The expression is in the disjunctive ; not delegated *nor* prohibited. The inference is, therefore, fair, that if a power is delegated, or prohibited, it is not reserved. Every power given by the constitution, unless limited, is entire, exclusive, and supreme. The national authority over subjects placed under its control, is absolutely sovereign ; and a sovereign power over the same subject cannot co-exist in two independent legislatures. Uniform laws on the subject of bankruptcies are contemplated in the constitution. The laws of the different States must be, of course, multiform ; and, therefore, not warranted by the constitution. The same clause which provides for the establishment of uniform laws on the subject of bankruptcies, provides also for " a uniform rule of naturalization." In the first clause of the same section, it is declared, that " duties, imposts, and excises, shall be uniform throughout the United States ;" and in the 9th section it is further declared, that " no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another." In the three last cases, it is admitted, that Congress alone can legislate ; and by the same reasoning, Congress only can make laws on the subject of bankruptcies. It is a national subject ; and, therefore, the power over it is in the na-

1819.

Sturges
v.
Crownin-
shield.

tional government.   Before the adoption of the con-
stitution, partial laws were enacted by the States on
the subject of foreign commerce, of the commerce
between the States, of the circulating medium, and
respecting the collection of debts. ' These laws had
created great embarrassments, and seriously affected
public and private credit.   One strong reason for a
national constitution was, that these alarming evils
might be corrected.   The constitution provides this
remedy.   It takes from the States the power of re-
gulating commerce, the power of coining money,
and of regulating its value, or the value of foreign
coin. : It prohibits, in terms, the issuing of paper
money, the making any thing but gold and silver a
tender in the payment of debts.   It provides for the
establishment of national Courts, extends the judicial
power to controversies between citizens of different
States, and between the citizens of the respective
States and foreign subjects or citizens : and yet it is
urged, that it leaves in the States the power of ma-
king laws on the subject of bankruptcies, whereby
by contracts may be destroyed.   If the convention
had intended that Congress and the State legislatures
might legislate on this subject, we should expect to
see the powers of these respective sovereignties ex-
pressed, and a definition of them, at least, attempted.
We might expect this, because, in several cases in the
constitution, it appears that this course had been pur-
sued.   Section 4. art. 1., sect. 8. art. 1. compared
with sect. 2. art. 2., sect. 9. art. 1., sect. 10. art. 1.,
sect. 1. art. 2., sect. 3. art. 4., and art. 5., furnish
instances of powers of this character.   It is said,

that the power in question is not declared to be exclusive in Congress. We answer, nor is any power so declared, except that of legislating for the ten miles square, the seat of government. It is said, again, that the exercise of this power is not prohibited to the States. Nor is the power to provide for the punishment of piracy and other crimes committed on the high seas; nor of making a rule of naturalization; nor of the regulating the value of coin; nor of securing to authors and inventors the exclusive right to their writings and discoveries, prohibited. Yet who doubts that legislation by the States on those subjects is opposed to the spirit of the constitution? It is also objected, that Congress are vested with the power of laying and collecting taxes; and yet, this power is rightfully exercised by the States. This is admitted, and we contend, that comparing the 8th and 10th sections of art. 1. there is a strong implication of a reservation of power, in this case, to the States. In the 8th section, *granting* powers to Congress, *taxes*, duties, imposts, and excises, are specified. In the 10th section, *prohibiting* the exercise of powers by the States, the word *taxes* is omitted, undoubtedly by design. Besides, there is no incompatibility in the exercise of this power by the two sovereignties; and we concede that, upon the true principles of the constitution, the powers not prohibited to the States, nor in their nature exclusive, still remain in the States. It will be argued, that, if Congress declines to exercise the power of making laws on the subjects of bankruptcies, the States may exercise it. But we contend, that the whole subject is en-

trusted to the national legislature ; and if it declines to establish a law, it is to be considered as a declaration, that it is unfit that such a law should exist: and much stronger is the inference, if, as in 1805, Congress *repeal* such a law.  It will, perhaps, be asked, if this construction of the constitution be correct, how it is, that so many States, since the adoption of the constitution, have passed laws on the subject of bankruptcies.  On examination, it will appear, that no acts, properly called bankrupt laws, have been passed in more than four or five of the States.  There are, indeed, insolvent laws, by which the bodies of debtors, in one form or another, are exempted from imprisonment, in nearly all the States. Rhode Island had an act in existence, when the constitution was adopted, by which the debtor might, on application to the legislature, be discharged from his debts.  In New-York, a law of the same character has been in operation since the year 1755, and also in Maryland, for a long period.  In Pennsylvania, a bankrupt law operating only in the city and county of Philadelphia, existed for two or three years ; and in Connecticut, the legislature has often granted a special act of bankruptcy on applications of individuals. But in all the other States, their laws on this subject have been framed with reference to the exemption of the body from imprisonment, and not to the discharge of the contract.  In Massachusetts the idea has prevailed so extensively that the power of Congress is *exclusive*, that no bankrupt law was ever passed by the legislature of that State.[a]  It cannot be denied,

----

a Blanchard v. Russell, 13 *Mass. R.* 1.  " It has often been observed by those who advocated a bankrupt law in this com-

that if Congress exercise this power, the States are devested of it. But what species of power is this? Laws made by independent legislatures, expire by their own limitation, or are repealed by the authority which enacted them. Here, however, is a novel method of, destroying laws. They are not repealed; do not cease by their own limitation; but are suspended by the interference of another independent legislature. It is difficult, upon this construction, to define this power of the States.

2. The act of the State of New-York, pleaded in this cause, is a bankrupt law within the meaning of the constitution of the United States. By this law, on the application of any person imprisoned or prosecuted for a debt; or, on the application of any creditor of a debtor imprisoned, or against whom an execution against his goods and chattels hath been re-

monwealth, with a view to the relief of an unfortunate class, of debtors from existing embarrassments, that the object of the framers of the constitution, in this prohibition upon the States, was to prevent tender laws and other expedients of a like nature, which had been resorted to in some of the States, to the great prejudice of creditors ; and that this article of the constitution ought to be construed with reference to such intention. But the words are too imperative to be evaded. " No State shall emit bills of credit, make any thing but gold and silver a tender in payment of debts, pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts." It would be contrary to all rules of construction to limit this latter clause of the constitution to a subject which is expressly prohibited in a preceding sentence. Full operation ought to be given to the words of an instrument so deliberately and cautiously made as was the constitution of the United States."

turned unsatisfied, he having sixty days notice there-of, proceedings may be had before certain tribunals by the act established, whereby all his property may be taken and divided among his creditors, and he liberated from imprisonment, and discharged from all debts. It will be insisted, in support of the plea, that this law is an insolvent law. What is an insolvent law? Insolvent laws are derived from the *cessio bonorum* of the *Roman law*, and discharge the person, and not the future acquisitions of the debtor. A judgment, assignment, or cession, under that law, does not extinguish the right of action; it has no other effect than to release from imprisonment. A bankrupt law establishes a system for a complete discharge of insolvent debtors. An insolvent law is an act occasionably passed for the relief of the body of the debtor. A bankrupt law, as distinguished from an insolvent law, is a general law, by which all the property of the debtor is taken and divided among his creditors, and he discharged from his debts, and made, as it is sometimes said, a new man. But if this be not a bankrupt law, then it may remain in force if Congress should exercise its power. Would then the laws on the subject of bankruptcy be uniform? It is impossible to believe, that the Convention meditated such an absurdity. On this point the cases are numerous and strong. In Golden v. Prince,[a] the law of Pennsylvania, which was similar to that of New-York, was treated, both by the bench and bar, as a bankrupt law. In Blanchard v. Russell,[b] the statute now pleaded, was declared by the Supreme

---

a 5 *Hall's Law Journ.* 502.     b 13 *Mass. Rep.* 1.

Court of Massachusetts, to be a bankrupt law. In Smith v. Buchanan,[a] the law of Maryland was so considered by the English Court of K. B. In Proctor v. Moore,[b] a special act of the legislature of Connecticut, is considered as a bankrupt law by the Supreme Court of Massachusetts. In the case of Blanchard v. Russell, Mr. Chief Justice Parker says, speaking of the statute now in question, " The law under which the debtor claims to be discharged, is a general law, intended to affect all the citizens of the State of New-York, at least, and it provides a system by which an insolvent debtor may, upon his own application, or upon petition of any of his creditors, be holden to surrender all his property, and be discharged from all his debts. It is, therefore, a bankrupt law, and to be distinguished from insolvent laws, technically so called." But this is said not to be a bankrupt law, because such laws apply only to traders, and this embraces every debtor. The first English bankrupt statute, that of Henry VIII. c. 1. makes a *general* provision ; and this is declared to be the foundation of the whole system. It is true, by various subsequent statutes, it was limited ; but the construction now given to those statutes embraces various descriptions of persons, who are not merchants or traders. It is not, therefore, an essential feature of a law on the subject of bankruptcies that it should extend to traders only. It is further urged, that by the English bankrupt laws, an act of bankruptcy devests the debtor of his property, and the

a 1 *East*, 6.        b 1 *Mass. Rep.* 198.

proceedings always originate with the creditor. By the 16th section of the law under consideration, the creditor may originate proceedings, under certain circumstances ; and all grants and dispositions of property made after a certain time are declared void. What constitutes this, and other similar laws, bankrupt laws, is, that thereby an absolute discharge of the body of the debtor and his future acquisitions of property is obtained. In this it differs from insolvent laws.

3. This act is a law impairing the obligation of contracts, and, therefore, unconstitutional and void. A contract is an agreement to do, or not to do, a particular thing. Its obligation binds the parties to do, or not to do, the thing agreed to be done, or not done, and in the manner stipulated. Whatever relieves either party from the performance of the contract in whole or in part, impairs its obligation. It is, however, said, that if the contract is made in the State where such law exists, the parties have reference to it, and it is a part of their contract. This is a *petitio principii*. If the act be unconstitutional and void, the parties regarded it as such, and, of course, did not look to it as binding. A law, declaring that debtors might be discharged on paying half the sum due, or that the creditor might recover double the sum due, are alike void ; or else, all contracts are at the mercy of the Legislature. Legislatures act within the limits of their powers, only when they establish laws to enable parties to enforce contracts ; laws to afford redress to the injured against negligence and fraud in not performing engagements : and

Courts act within their proper sphere, when they confine themselves to the exposition of those contracts, and giving efficacy to the laws.

4. But even admitting this act to be constitutional as to all contracts made *after* it was passed, it was clearly unconstitutional and void as to all contracts *then existing*, as it was an act or law impairing their obligation. The first impression of any man, learned or unlearned, is, that a law which discharges a contract, without an entire performance of it, impairs its obligation. A law which declares, that a bond given for the payment of 1000 dollars may be cancelled, and the obligor freed from all liability to suit thereon, upon the payment of 500 dollars, certainly materially affects the obligation of the contract, and impairs it. It will be urged, however, that though the words in the constitution are broad enough to include the case, yet they are to be construed according to the intent of the framers, and that the prohibition of such laws as that in question was not intended by the constitution. Surely, language here, as every where else, is to be understood according to its import. If by a law impairing the obligation of contracts, we are not necessarily to understand a law relieving either of the contracting parties from the performance of any part, or the whole of the stipulations, into which he has entered, we ask for a definition of such law. In the case before the Court, it appears, that the defendant, in March, 1811, in New-York, gave to the plaintiff his promissory note, payable in August, 1811, for 771 dollars, and 86 cents. In April, 1811, the law under consideration was

passed, and thereby the legislature of New-York declare virtually, that if the defendant shall deliver up all his property for the benefit of all his creditors, and that property shall be sufficient to pay ever so small a proportion of his debts, the plaintiff shall never thereafter prosecute the defendant for the remaining sum, but that the contract shall be discharged. The language of the constitution expressly forbade the legislature from making such law. The prohibition is plain and unequivocal—needs no comment, and is susceptible of no misinterpretation. And why should we seek to affix any other than their natural meaning to the terms used ? It is certainly a sound rule not to attempt an interpretation of that which is plain, and requires no interpretation. This is the rule in relation to treaties and public conventions ;[a] and surely is applicable to a constitution where every word and sentence was the subject of critical examination, and great deliberation. Nor is it admitted, that the Convention in their prohibition did not look directly to a law of this nature. It was notorious, that the States had emitted paper money, and made it a tender; had compelled creditors to receive payment of debts due to them in various articles of property of inadequate value ; had allowed debts to be paid by instalments, and prohibited a recovery of the interest. All these evils, so destructive of public and private faith, and so embarrassing to commerce, the Convention intended, doubtless, to prevent in future. The language employed speaks only of paper

- a Vattel, l. 2, c. 17. s. 263.

money and tender laws, by a particular description. Was nothing else intended? Why then add the comprehensive words " *or* law impairing the obligation of contracts?" Its language, taken in connection with the subject, is equivalent to this declaration : " The State governments have abused their power. They shall no more interfere between debtor and creditor. They shall make no law whatsoever impairing the obligation of contracts." In Golden v. Prince,[a] and Blanchard v. Russell,[b] already cited, the Circuit Court in Pennsylvania, and the Supreme Court of Massachusetts, expressly adopt this construction of the constitution. In the last case, Mr. Chief Justice Parker says, " A law made after the existence of a contract, which alters the terms of it by rendering it less beneficial to the creditor, or by defeating any of the terms which the parties had agreed upon, essentially impairs its obligation, and, for aught we see, is a direct violation of the constitution of the United States." The same doctrine is also recognized by the Supreme Court of Massachusetts, in Call v. Hagger,[c] by Mr. Justice (now Chancellor) Kent, in Holmes v. Lansing,[d] and by the Supreme Court of North Carolina, in Crittenden v. Jones.[e]

5. This act is retrospective, and, therefore, void. The act was passed after the note was made. *Ex post facto* laws which regard crimes, are not only declared void by the constitution, but they are opposed to common right. The same is true of retrospective laws

a 5 Hall's Law Journ. 502. b 13 Mass. Rep. 1.
c 8 Mass. Rep. 423. d 3 Johns. Cas. 73.
e 5 Hall's Law Journ. 520.

in civil matters.  They are not made to enforce, but to violate contracts; and are, therefore, considered repugnant to natural justice.  In the case of the Society for propagating the Gospel, &c. v. Wheeler,[a] Mr. Justice Story says, " upon principle, every statute which takes away or impairs a vested right acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past, must be deemed retrospective."  In Dash v. Van Kleeck,[b] the Supreme Court of New-York says, " an act of the legislature is not to be construed to operate restrospectively, so as to take away a vested right.  It is a principle of universal jurisprudence, that laws, civil or criminal, must be prospective, and cannot have a retrospective effect."

Mr. *Hunter*, contra, stated, that before he proceeded to the discussion of the question before the Court, he would relieve himself, if not the Court, from the pressure of an authority of the utmost respectability, which, if it stood single and unopposed, would be irresistible.  He referred to the case of Golden v. Prince, decided by Mr. Justice Washington; but the truth is, that opinion was more conspicuous because it stood alone; no other judge of this Court, or of any State Court, had so decided: but, on the contrary, that opinion had been decided against in several instances since its publication.[c]  The coun-

*a* 2 *Gallis.* 139.          *b* 7 *Johns. Rep.* 477.

*c* Hannay v. Jacobs, ruled by Mr. Justice Johnson, in the Circuit Court of South Carolina.  Adams *et al. v.* Story de-

sel also referred to the earlier opinions on the question; to the discussion and decisions, which took place in the legislature of Maryland, soon after the adoption of the constitution, as mentioned by Mr. Chief Justice Tilghman, in his opinion in Mr. Hall's Law Journal.[a] To a decision in Connecticut, in 1794, a MS. statement of which had been furnished him by an eminent lawyer of that State, and the accuracy of which would be readily acknowledged. " One Huntington petitioned the General Assembly for a special act of insolvency. While the petition was pending, he prayed for a writ of protection. His creditors directed the sheriff to attach his body, and commit him to prison, on the ground that the assembly had no power of granting his petition, and, of course, the writ of protection was void. The sheriff accordingly committed him. Huntington then prayed for a *habeas corpus* from the assembly, which was granted, commanding the sheriff to release him, which was done. The creditors brought an action against the sheriff, before the Circuit Court, in which it was determined by Mr. Justice Chace, that a State had the right of passing special insolvent acts without infringing the constitution." In the Circuit Court of Rhode Island, several cases had occured about the same period. In Murray *et al.* v. Thurber, a discharge under the insolvent law of Rhode Island was pleaded in

termined by Mr. Justice Livingston, in the Circuit Court of New-York. 6 *Hall's Am. Law Journ.* Blanchard v. Russel, 13 *Mass. Rep.* 1. Farmers' & Mechanics' Bank v. Smith, 6 *Hall's Am. Law Journ.* 547.

    *a* 6 *Hall's Am. Law Journal.*

bar; and upon demurrer, and after argument, princi-pally upon the constitutionality of the law, judgment was given by Mr. Justice Wilson, in favour of the plea. In 1798, the case of Cock and Townsend v. Clarke and Burges, occurred. This was an action brought by the plaintiffs, citizens of New-York, against the defendants, citizens of Rhode Island, on two promissory notes. After several continuances, the defendants pleaded in bar to the action, since the last continuance, their discharge under the insolvent law of Rhode Island; and upon a general demurrer, the constitutionality of the law was elaborately ar-gued. Every leading principle laid down in the de-cision of Golden v. Prince, was suggested by the plaintiff's counsel; but they were overruled in an elaborate opinion of Mr. Chief Justice Ellsworth. Other cases had occured in the same State, but the most important was one, the name of which could not be recollected, determined by Mr. Chief Justice Jay, in his first circuit in Rhode Island, very soon after that State had adopted the constitution. The de-fendant pleaded a license or indulgence granted him, by a law of the legislature of Rhode Island, exempting him for a certain number of years from the payment of his debts, and suits, &c. The ar-gument principally turned upon the proper construc-tion of that clause in the constitution, which prohi-bits the State legislatures from passing any law im-pairing the obligation of contracts. The Chief Jus-tice went fully into the principle; admitted the power of the State to pass insolvent laws, from the power inherent in every community to give relief to dis-

tress, and to protect its citizens from perpetual imprisonment; from the impossibility of compelling payment where there was no property; from the right of the States to pass insolvent laws as they had always previously done, as they had only granted to the United States the power of passing bankrupt laws, which were very different in his conception from insolvent laws. He stated it as his opinion, that, by an insolvent law, the contract was not, in the sense of the constitution, impaired. But the practice of suspending the collection of debts, of granting licenses and indulgences against the consent of the creditor, of impairing the obligation of a contract as to the important point of time when a debt by its terms was payable, and denying all remedy by action, merely for the convenience of the debtor, when his ability was confessed, he strongly and severely reprehended, as an infraction of the constitutional injunction. The accuracy of this statement of the case is verified by the effects. The docket of the legislature of Rhode Island was immediately cleared of every petition praying for time, licenses, indulgences, &c.; and no one has ever since been sustained. But they have continued to act, as heretofore, upon their insolvent system.

1. It is, however, admitted, that this question has not been determined by the Supreme Court, sitting as such; and we are bound to inquire whether these decisions of its former illustrious members were founded in error, and whether they cannot be supported by reasoning. On the other side it is said, in the first place, that Congress have power to pass uniform laws on the

subject of bankruptcy throughout the United States. That if an unqualified power be granted to a government to do a particular act, the whole of that power is disposed of, and not a part of it; consequently, that no power over the same subject remains with those who made the grant, either to exercise it themselves, or to part with it to any other authority. If the principle were applicable to the subject, and correct in its hypothesis, it would be a truism which nobody would be disposed to dispute. But if it be not applicable to the subject, and if the hypothesis is not previously proved, it is a *petitio principii*; a gratuitous assumption of that which is to be proved. The test of this principle consists, in the first place, in the inquiry, what was the particular act, to do which, a power, an unqualified power, was granted? It was a power to pass uniform laws on the subject of bankruptcies throughout the union; not on the subject of insolvencies in the particular States. It is to pass *bankrupt*, not *insolvent* laws. No two things are more clearly distinguishable; they mean, and always have meant, in English and American jurisprudence, different things. Undoubtedly they are analogous subjects; but *nullum simile est idem*. In speaking of the state of suspension or denial of payment, we say, *bankrupt*; that is, a merchant who, committing certain acts, gives evidence that he is criminally disinclined to pay, and who may nevertheless not be insolvent: or, we say, an *insolvent*; any man who is at once poor and in prison; who surrenders all he has; pays as far as he can; and who, from the absolute want of means, is physically incompetent to pay

more.[a]   We refer to terms in the English language, that have been contradistinguished in their use, so far as we can trace them, for nearly three centuries. Both the terms, bankrupt and insolvent, are familiar in the law of England; and it will be conceded, that whenever a term or phrase is introduced, without comment or explanation, into our constitution or our statutes, every question respecting the meaning of that term or phrase, must be decided by a reference to that code from whence it was drawn.   In the earliest times, neither bankruptcy nor insolvency were subjects of English jurisprudence.   Of the general code of the primordial common law, they formed no part, for the plain reason, that anciently imprisonment for debt, which is now the main proof of bankruptcy, and consummation of insolvency, was unknown to the common law.   It was even against Magna Charta.[b]   The nature of the population of England in feudal times, developes the cause.   The different counties of England were held by great lords; the greater part of the population were their villeins; commerce hardly existed; contracts were unfrequent. The principal contracts that existed were with the lords and their bailiffs, the leviers of their fines and amercements, receivers of their rents and money, and disbursers of their revenues.   In the year 1267, imprisonment for debt was first given against the bailiffs, by the statute of Marlbridge, 52 Hen. III. c. 23.[c] The statute of Acton Burnel, 11 Edw. I., gave the

---

a Hassels v. Simpson, *Dougl.* 92. note.
b *Burgess on Insolvency*, 5.   *Co. Litt.* 290. B.
c *Burgess on Insolv.* 18, 19.   *F. N. B. Accompt*, 117.

first remedy to foreign merchants by imprisonment, in 1283. The statute 13 Edw. I. c. 2. gave the same remedy against servants, bailiffs, chamberlains, and all manner of receivers.[a] These instances show how imprisonment for debt first commenced, how few were at first included, and accounts for the non-existence of legal insolvency. The statute of 19 Hen. VII. c. 9. which gave like process in actions of the case and debt, as in trespass, is the true basis of the right, or wrong, of general imprisonment. This statute, and the usurpations of the various courts, produced their natural effects. They filled the gaols of England with prisoners for debt. This state of things produced, sixty years afterwards, the statute 8 Eliz. c. 2. restricting the right of imprisonment, and guarding against its abuses; but this was not sufficient. She issued the proclamation of the 20th of April, 1585, authorizing certain commissioners, therein mentioned, to order and compound controversies and causes.[b] This commission continued in force until her death, and, according to the political system of the times, had the force of law. James I., aided by the counsels and the pen of Lord Bacon, on the 11th of November, 1618, issued a similar, but enlarged, commission, in which the term *insolvency* is expressly mentioned, and its nature described.[c] Charles I., in 1630, issued a similar commission.[d]

1819.

Sturges
v.
Crownin-
shield,

a *Burgess*, 24. 27.

b *Rymer's Fed. tom.* 17. *fol.* 117. *Burgess*, 84.

c *Rymer's Fed. tom.* 17. *p.* 116. *Rot. Parl.* 16 *Jac.* I. *Burgess*, 88.

d *Burgess*, 95.

The first insolvent law, similar in language and design to these ordinances, and meant to supply their place, was passed after the execution of Charles I. by the republican parliament in 1660.[a] In the 23d Charles II. the first great regular insolvent act was made, the model of all that follow; its provisions and language having been copied by the subsequent parliaments in England, and by our colonial legislatures, with almost unvarying exactness. About forty acts of insolvency have passed from that time to the present in Great Britain; until at length a regular system of insolvency is established; and Courts possessing a peculiar jurisdiction, clearly and practically contradistinguished from bankruptcy, decide cases of insolvency in one room of Guildhall, while commissioners of bankruptcy are deciding cases of bankruptcy in another.[b] It appears, then, that insolvency is the creature of statute, and has been described, settled, and ascertained, in a course of centuries, by plain, positive, parliamentary enactments: and this is likewise true of bankruptcies. In strict chronology, the bankrupt laws existed first. The first statute of bankruptcy was passed in 1542, the 34th of Henry VIII.; but the 13th of Eliz. and the 21st of James I. are the principal and all-important statutes. These and others, amounting to fourteen or fifteen different acts, continued down to Anne and George III., form the present system of bankruptcy

a *Scobell's Ordinances*, 56.   *Burgess*, 98.

b *Burgess*, 176.   See the Report to the British House of Commons on bankruptcies and insolvencies, in 1817.

in England. Thus, while the ordinances of Elizabeth and James, and the various statutes, down to the present times, were passed, expressly on the subject of insolvency, for the benefit of all poor prisoners confined for debt, including all classes in society, the parliament was, at the same time, passing statutes of bankruptcy, maturing and accumulating that peculiar code, confined as it was to merchants and traders only.[a]  The distinction between bankrupt and insolvent laws was perfectly well known to our ancestors, who, in their legislation and usages, have always considered insolvent as different from bankrupt laws.  All the colonies, in some shape or other, had insolvent laws.; few had bankrupt laws.  In 1698, Massachusetts passed an insolvent law : that is, a law for the relief of poor prisoners confined for debt.[b]  In 1713, that colony passed an act concerning *bankrupts*, and for the relief of the creditors of such persons as shall become bankrupts ; this was a temporary law, which failed in experiment, and expired in 1716. By this historical deduction it is intended to prove, that the particular act which the States granted to Congress a power to pass, was one having reference to bankruptcies; which meant something contradistinguished from insolvencies.  It is not denied, that insolvency, in its most comprehensive sense, is a universal, of which bankruptcy is a particular ; but taking it in this sense, it is insisted, that the grant

a *Burgess*, 212.  2 *Bl. Com.* 476.  *Christian's Note.*  2 *Wils,* 172.  *Cooke's Bankr. Law*, 42.  *Rees's Encyclop. Title Insolvency.*  2 *Montefiore's Com. and Law Dict.* 390.

b *Mass. Laws*, 130.  London Edit. 1724.

1819.

Sturges
v.
Crownin-
shield.

to Congress narrows the universality of the previous power of the States, only by excluding from it the ancient, and well understood, distinct matter of bankrupt laws. But it is in more exact conformity to the facts, and, therefore, more precise language and safer reasoning, to say, that modified as this matter is, and has been for centuries in practice, they are different things expressed by essentially different terms. How has this subject been considered between the two constitutional parties, the Congress of the United States, and the individual States ? Surely, they knew what the one granted, what the other received. The last have always asserted their power of passing insolvent laws : The former have always assented to the exercise of this power without the smallest complaint of injury or usurpation. Very soon after the adoption of the constitution, a bankrupt law was introduced into Congress ; it was postponed on the ground that the State insolvent laws were sufficient. The whole debate turns on the acknowledged and well understood differences between the two laws.[a] Congress when at last, in the year 1800, it acted on this subject, took care solemnly to enact that the bankrupt law should not repeal or annul, or be construed to repeal or annul, the laws of any State now in force, or *which may be hereafter enacted.*[b] In all the abortive attempts to pass a new bankrupt law, every committee of the House of Representatives and Senate introduced the same clause. Thus, it appears that the two parties,

     a *Debates of Congress, vol. 2. p.* 204.
     b Act of April 4th, 1800. c. 173. s. 51.

whom.it is sought to make litigant, essentially and cordially agree, and *that* upon a point of power. Who have a right to say they disagree? To interfere to make them disagree? Congress, in asserting the claim of the United States to priority of payment over other creditors, exerts this right solely in cases of *legal* insolvency: and this Court has frequently, and after great deliberation, in sanctioning this claim, considered and defined legal insolvency.[a] How preposterous this if no legal insolvency can exist! Congress itself has passed an insolvent law for the District of Columbia. This it has done, because *there* it had the power of exclusive legislation. It has done for its District of Columbia what the States can do for themselves: what Congress cannot do for them. Again; by the declaration of rights of many of the States, it is asserted, " that the person of the debtor, when there is not strong presumption of fraud, ought not to be continued in prison after delivering up his estate in such manner as shall be prescribed by law." This supposes a rightful, permanent system of insolvency by State authority.

2. But admitting, for the sake of the argument, that this grant of power to Congress includes all that can be comprehended both under insolvencies and bankruptcies, we contend, that, from the peculiar nature of the subject, to convert the grant of power into an actual prohibition of its exercise by its former possessors, it must actually *be exercised* by its

---

a The United States v. Fisher, 2 *Cranch*, 358. United States v. Hooe, 3 *Cranch*, 73. Prince v. Bartlett, 8 *Cranch*, 431. Thelluson v. Smith, 2 *Wheat*. 396.

present possessors. This arises from the very nature of the subject; from the nature and condition of human affairs; from an overruling necessity: for, the duties of humanity are imperative and indispensable, and must be exercised by some one or other of the guardian powers of the community. The existence of the power of granting relief in the extremities produced by debt and indigence, is morally necessary, not only to the well being, but to the existence of civilized and commercial society; and if one authority in a nation devests itself of this by a grant to another authority, it imposes its exercise as a duty on that other; and if the one does not exercise it, the other, by necessity, *must*. The power, in this sense, remains concurrent. This principle may be illustrated by an analogous question of international law. Denmark, by its position as to the Baltic and its entrances, owes a duty to the navigating interest of the world, of guarding their ships from peril and from shipwreck. She has, so far as is practicable, by her buoys, her light-houses, her pilots, performed this duty. Suppose she were to cede, by treaty, the benefit she derives from this source; grant the right, and impose the duty upon her neighbour and rival, Sweden. Suppose Sweden was to forbear or neglect to exercise it; could not Denmark exercise it? Would she not be bound to exercise it, by all the obligations of humanity? Are the buoys to be torn up, the pilots to be suppressed, the lights to be extinguished? Are the coasts of both countries to be lined with shipwrecks, her own subjects to suffer, and her great duties to the civilized world to be neglected and vio-

lated ?  Is this analogy too remote ?  All the duties
of humanity are associated: *quoddam commune vin-*
*culum habent.*  Why was this power over bank-
ruptcies granted at all ?  Undoubtedly that it might
be exercised, being necessary for the good of the
community ; and, if its exercise is supended, may it
not, justly and properly, be reassumed, until again
exercised by that which is conceded to be the para-
mount authority.  This concurrent power of the States,
from a similar, though less imperative necessity, exists
in various other cases.  Congress has the whole power
of regulating commerce with foreign nations.   The
most important medium of foreign commerce, is foreign
bills of exchange, which are, therefore, important
subjects of commercial regulation.  There can hardly
be imagined a duty more incumbent on Congress,
than this exercise of its admitted power of legisla-
tion.   Yet it has neglected that duty ; and as it is a
power that from the necessity of the thing must be
exercised, the States may and do exercise it, and their
rightful use of this power has been sanctioned by this
Court in innumerable instances.  Congress has power
to regulate the value of foreign coins ; it was long
before it exercised this power as to any foreign coins,
and still omits to do it, as to the greater number.
Have these foreign coins then no value ?   So also,
Congress has power to fix an uniform standard of
weights and measures.   This has never been done.
Is there then no standard, and are all contracts rela-
tive to quantity, to weight and measure, destitute of
a legal medium of ascertainment ?   If Congress had

1819.

Sturges
v.
Crownin-
shield.

neglected to establish post roads, would not the States have had power to provide for so great a public convenience; a benefit which they always enjoyed, even in colonial times? As to the power of Congress to establish an uniform rule of naturalization, it may be necessarily exclusive, because if each State had power to prescribe a distinct rule, there could be no uniform rule on the subject: and naturalization, or the power of making aliens citizens, must have uniformity; since the citizens of each State are entitled to all the privileges and immunities of the citizens of the several States: it is a power that must pervade the Union. But insolvent laws have no extra-territorial force unless by consent; they are made by the State, for the State; at any rate, a single State has no inherent power of forcing them upon the other States. This depends upon the old question of the *lex loci*. The reasoning adopted by that learned lawyer and accomplished scholar, Mr. Chancellor KENT, in the case of Livingston v. Van Ingen,[a] may, with the strictest propriety, be applied to this case. Congress has the power of securing, for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries. To the mere importers of foreign inventions, or foreign improvements, Congress can grant no patent; are not the States at liberty, in this omitted case, in this different matter, to promote the progress of science and useful arts, by pursuing their own measures, and dispensing their own rewards? Even supposing they cannot legislate upon

*a* 9 *Johns. Rep.* 572.

1819.

Sturges
v.
Crownin-
shield.

the peculiar and admitted objects of congressional legislation, yet they may on others. If not, this great subject of imported improvements, would be entirely unprovided for, and unprotected. Applications to Congress on this very subject, have been frequently made, and always rejected for want of power. The analogy between our argument and that presented in the case of Livingston and Van Ingen, is this : that if Congress had exercised all its power, it would not have exhausted the subject. Congress has not the power to pass a general insolvent law ; the States have a power to pass State insolvent laws ; the objects and spheres of legislation are different ; Congress has power to pass a bankrupt law, and if it does, that will be paramount.—Having safely possessed ourselves of this ground, we may ascend a little higher. We are justified in saying, that the States are not prohibited from passing even bankrupt laws. They once had the power, and they gave away, in conjunction with the other States, only that of passing uniform laws of bankruptcy throughout the United States. In this sense, the power they have granted, and that they retain, are different. The grant to Congress is not incompatible. We have shown that the mere grant of a power to Congress does not vest it exclusively in that body. There are subjects upon which the United, and the individual, States, must of necessity have concurrent jurisdiction. The fear that the rights and property of the citizens will be worn away in the collision of conflicting jurisdictions, is practically refuted ; and is even theoretically unfounded, because the constitution itself has guarded against this, by providing that

1819.

Sturges
v.
Crownin-
shield.

the laws of the United States, *which shall be made,* shall be the supreme law of the land, any thing in the constitution or the laws of any of the States to the contrary notwithstanding.

3. But the other great point remains; is not this law unconstitutional and void, in as much as it impairs the obligation of a contract? As preliminary to this inquiry, it may be suggested, that if it has been proved that a bankrupt law is not an insolvent law, and that the Convention, with a perfect knowledge of the subject, left the States in the full enjoyment of the right they had always possessed, of passing insolvent laws, and subjected them to the domination of uniform bankrupt laws only, whenever Congress might pass them, the position is disproved, which alleges that such laws are still void, as impairing the obligation of contracts. From the nature of the subject, it is not supposable, that the Convention left a power in the States, which, if exercised, must necessarily violate another part of the constitution. It is not conceivable, that a power was given, directly repugnant and contradictory to a prohibition imposed: as almost all the States have passed insolvent laws, and Congress has sanctioned them, and the people assented to, and approved them; let us find out some other interpretation that will reconcile these opposite powers, and obviate this flagrant inconsistency. The judges of the State Courts, and of this Court, have confessed that there is, in these words, "impairing the obligation of contracts," an inherent obscurity. Surely then, here, if any where, the maxim must apply, *semper in obscuris quod minimum est sequimur.*

1819.

Sturges
v.
Crownin-
shield.

They are not taken from the English common law, or used as a classical or technical term of our jurisprudence in any book of authority. No one will pretend, that these words are drawn from any English statute, or from the States' statutes before the adoption of the constitution. Were they, then, furnished from that great treasury and reservoir of rational jurisprudence, the Roman law: we are inclined to believe this. The tradition is, that Mr. Justice Wilson, who was a member of the Convention, and a Scottish lawyer, and learned in the civil law, was the author of this phrase.[a] If, then, these terms were borrowed from the civil code, that code presents us with a system of insolvency in its *cessio bonorum;* and yet, as it is said by Gibbon, " the Goddess of Faith was worshipped, not only in the temples, but in the lives of the Romans." The rights of creditors, we know, were protected by them with the utmost vigilance and severity. They did not, however, it seems, conceive that a *cessio bonorum* was inconsistent with the rights of creditors, or impaired the obligation of contracts. England, also, anxiously guards the rights of creditors. On commerce, on the integrity of her merchants and manufacturers, her best reputation and interest depends. And yet England, more than any other country, has her system of insolvency and bankruptcy. Good sense, in all ages, in all countries, is the same; as in Rome, in England, and in all other commercial countries, so in this, bankrupt and insolvent laws have never been considered as impairing the obligation of a contract. If included in the lite-

a. See *Reid's Essay, vol.* 4. *p.* 183.

ral acceptation of the words of this clause of the constitution, from the nature of things, they form an implied exception. Insolvent laws are based upon the confessed and physical inability of a party to perform a pecuniary contract, otherwise than by a surrender of all he has. How idle, then, to make a provision in respect to such laws, guarding against the impairing a contract; that is, providing for its strict, adequate, and undiminished performance, when the impossibility of any performance is pre-supposed. The total, physical inability of the individual is his exemption, and this is tacitly and necessarily reserved and implied in every contract. This is the doctrine of Vattel, of a nation as to a public treaty;[a] and is it not the law of nations, that the obligations of a treaty shall not be impaired? To impair an obliga- tion has reference to the faculty of its being per- formed. The obligation of a contract, and a remedy for its performance, are different things. Whether a contract shall be fit matter for judicial coercion is a different question from its being preserved perfect and undiminished where it is. When the Courts do take cognizance, they shall not adjudge less, or dif- ferently, either as to the amount, or other terms and conditions of the contract. The performance of the contract shall be exact ; imprisonment is the remedy for enforcing it : but where there is a confessed and adjudicated inability, the society withholds the power to protract indefinitely and miserably, what can never be an effectual remedy, but only a vindictive punish-

a *Vattel, l. 3, c. 6. s. 91.*

ment. The moral obligation of a contract may, per= haps, remain forever, but misfortune and extreme indi- gence put an end to the legal obligation, as war does to a treaty ; as revolution does to a pre-existing govern- ment ; as death does to personal duties. The im- possibility of payment discharges from contracts, as insanity does from crimes: "*Impossibilium,*" says even the severe Bynkershoek, "*nulla est obligatio.*" To *impair* means, as to individuals, you shall not pay less ; you shall not have an extension of time in which to pay ; you shall not pay in goods when your contract is cash ; you shall not pay in depreciated coin, or even current bank notes, when your contract binds you to the payment of pure coin ; interest shall not be diminished : in fine, there shall be no allevia- tion of its terms, or mitigation of its conditions. The facts as to which you engage shall remain the same. The insolvent law is something independent of the obligation of the contract, and extraneous to it. It is a matter of peremptory nonsuit to the action ; or rather a bar, having reference to nothing inherent in the contract, but to something exterior and poste- rior to it. The insolvent law, so far from impairing the contract, sets it up, admits its obligation, and endea- vours to enforce it, so far as it is possible, consistently with the misfortunes of the debtor, to enforce it. If it was meant by these words of the constitution to prohibit the passage of insolvent laws, why not in plain terms have said so ? It would have been as clearly understood as the plain prohibition, that no State shall grant any title of nobility. It could not have been meant to bury such a meaning under such

obscurity. To suppose that the framers of the constitution were designedly obscure on this delicate and dangerous subject, is an impeachment of their integrity ; to suppose that they had so little command of appropriate and perspicuous language as to employ such terms to express such a thought, is an unjust imputation upon their acknowledged talents. Upon the construction contended for, statutes of limitation would be repugnant to the constitution. Statutes of limitation take away the remedy after six years. The insolvent law, at once. But suppose the statute of limitation confined the remedy to sixty days, or six days; it would be an indiscreet, impolitic, and unwise, but not an unconstitutional law. If such statutes be valid, it must be because they do not impair the obligation of a contract. Yet the one law has the same effect on the contract as the other. They both take away the remedy, and neither annuls the obligation : for a subsequent promise in both cases revives the debt. If the contract was annulled, or its obligation impaired, a promise to pay would be void ; because it would be without consideration, and would be contrary to the very law that destroyed it. The writers on the civil law most clearly express the difference between the obligation of a contract, and the legal remedy for its performance.[a] Ayliffe, among other instances, refers to the very subject now under discussion : " Neither a civil nor a natural obligation," says he, " is dissolved by a *cessio bonorum;* though it produces a good exception in law, and suspends the force of an obliga-

a Ayliffe's Civ. Law. l. 4. tit. 1. Dig. 46. 3. 98. 8.

tion for a time; the extinguishment of an obligation being one thing, and the cessation of it another; for when the cessation of an obligation is once extinct, it never revives again." This is leaving the matter untouched and unregulated, as we contend it is, by the great fundamental law, to be provided for by ordinary legislation. If the States, influenced by the eloquent reasoning of Burke and Johnson, were to abolish imprisonment for debt entirely, could their right be disputed? And yet this might prevent the creditor from getting his money. The contract would remain to be enforced by other, but perhaps not equally efficacious, means. This reasoning, as to the distinctness of the remedy from the contract, is applicable to cases even where insolvency does not interfere; with how much more force where it does. It would be monstrous to parade the show, or urge the violence of a nominal remedy, when it could be none in reality. You must submit to necessity. When the sages of the Convention inserted this clause in our constitution, they meant no more or less than the inviolability of contracts; and what system of religious faith, or of ethics, or of jurisprudence, ever meant less? But they likewise meant, that this salutary, but universal principle, should be subjected to the salutary and indispensable exceptions to it, which always had prevailed, and always must prevail. Every contract must be subjected to, limited, and interpreted, by the law of nature, which every where forms a part, and the best part, of the municipal code; and it is the primary canon of that code, that necessity—physical, moral necessity—knows no law, but itself. Laws or

constitutions cannot create property in the individual; and, in a certain sense, in the absence of all fraud, where there is no property, there can be no injustice; of course no violation of a contract. Locke, in endeavoring to prove that the principles of morals are susceptible of as strict demonstration as those of mathematics, says, where there is no property there can be no injustice; for the idea of property being a right to any thing, and that the idea of injustice being an invasion of that right, it is evident that these ideas being thus established, and these names annexed to them, we can as certainly know these propositions to be true, as that a triangle has three angles, equal to two right angles.[a] And the civil law, perhaps the most exact, consistent, and comprehensive code the sagacity of man ever framed and systematised, expressly asserts the same principle: *Nam is videtur nullam actionem habere cui propter inopiam adversarii inanis actio est.—Desinit debitor esse is, qui nactus est exceptionem justam, nec ab naturali equitati abhorrentem.*[b] The States, then, in exercising the natural, inherent, and indispensable power, of discharging poverty, distress, and absolute indigence and inability, from payment, have not only conducted themselves lawfully and constitutionally, but the omission to have done it would have been impiously absurd; and it is an unjust imputation upon the constitution of the United States, to suppose a prohibition against the exercise of such a power *somewhere* in society. As to insolvencies, Congress cannot exercise it. As to bank-

---

a *Locke's Works, lib.* 4. *p.* 258. *fol. edit.*
b *Ayliffe,* 506. *Dig. l.* 4. *tit.* 3. *s.* 6.

ruptcies, they refuse. The States, therefore, must exercise this power. The obligations of natural law, and the injunctions of our religion, which religion is a part of our common law, imposes it as a duty that the wants of the poor should be relieved. Strange, indeed, is it, that the laws should at the same moment press upon society two duties, so inconsistent and contradictory, as that of exacting for the payment of his debts, what the impoverished and imprisoned debtor has not; and obliging those who have something, to give him a share of what they have, to save him from suffering or death. Although it has been strenuously insisted that the abstraction of the remedy is a violation of the contract, yet it has also been intimated, that if erroneous in this particular, the substance of the argument on the other side would still remain correct, in as much as not only the person of the debtor, but the debt itself, was discharged. It may perhaps be doubted, whether, though the person be discharged from the debt, the debt itself be extinguished. At the utmost, the tendency of the doctrine contended for, would be but to give the creditor a right to the miserable chance of the future acquisitions of the insolvent, by a future action; and that chance, rendered the more desperate by the consideration, that arrest, that is, imprisonment, is almost the only mode of instituting actions in the United States. Grant that the remedy may be given, or withheld, or modified, by the legislatures of the States, and the difference between us, in practical result, is not worth contending for. This could not be what the Convention had in view. According to the doctrine on

the other side, you discharge the debtor from prison, to condemn him to work in the mines, and that too with his chains upon him. You remit the lesser to inflict the greater punishment. You take him from a life of listless indolence, where you are obliged to maintain him, and doom him to a life of labour without hope. Nay, worse, you so place him as to have every step watched by a lynx-eye avarice; every morsel he puts into his mouth counted and weighed; every personal indulgence censured; every family sympathy scanned and reprimanded. Well was it said by a learned judge, that such freedom would be a mockery; nay, worse, it would be aggravated slavery and complicated misery. It is admitted, that the State has a right to the service of its citizens. It may open its prison doors even to criminals; what services can ever be rendered by him who is pressed down to the earth by a poverty that must be hopeless and interminable? The State wants the services of its citizens to fight its battles on the land and ocean, to cultivate its fields, to enlarge its industry, to promote its prosperity, to signalize its fame. It does not want a heartless, purposeless, mindless being—but half a man—a worse than slave.—It wants a citizen with all his worth and all his energies of body, mind, and soul. The line of distinction drawn, by the opposite counsel, between bankrupt and insolvent laws, is wholly mistaken. So far from the difference between them consisting in the circumstance of the bankrupt law discharging the debt itself, whilst the insolvent law discharges the person of the debtor only, it is an his-

torical fact, that the early English statutes of bankruptcy did not provide for the discharge either of the debt or of the person. *Discharge* is not mentioned, or in any way provided for, until the 4th or 5th of Anne; that is, after the system of bankruptcy had been established almost two centuries. But it is expressly provided for, it is the object and intention of the first regular insolvent law of England, in the time of Charles II. and of the act of 1755, which served as a model for colonial legislation. The law of New-York of 1755, and that of Rhode Island of 1756, were copied almost verbatim from this last. There is even now no discharge in the case of a second bankruptcy, unless the debtor pays seventy-five per cent. of his debt, and, in England, none at all, if he has even had the benefit of an act of insolvency.[a] A construction merely technical ought not to be given to such an instrument as a constitution of government. If any instrument ought to receive an equitable and liberal interpretation, affected by the events which preceded, it is that of a great treaty of confederation between various states who were compressed into union by obvious motives and considerations, of common wrongs sustained, mutual errors committed, and equal advantages to be gained. Our interpretation of such an instrument ought, at least, to be as liberal as of a remedial statute. We ought to be as unshackled as in the interpretation of a last will and testament, where the intention of the testator is the polar star to direct us;

---

[a] *Cullen's Bankr. Law*, 395. *in notis.* Act of Congress of 1800, c. 173. s. 57.

where we have a right, if the words are ambiguous, to seek for illustration from the condition and circumstances of the testator's family. What was the condition of the American family? What were the evils which this article of the constitution was intended to remedy? Undoubtedly those acts of desperation and violence, to which many of the States, in a paroxysm of revolution, resorted, and those acts of impolitic and selfish injustice to which they continued to resort, in that more dangerous moment, after the effect of mighty impulses had ceased, and was succeeded by inevitable relaxation and debility. These plainly indicate what were the evils, and demonstrate for what this remedy was intended. As to the effects of poverty, of indigence, of natural and moral impossibility to perform contracts, neither foreign nations, nor our own citizens complained. These must, and do, from the vicissitudes of human life, and the long catalogue of human ills, exist in all countries and societies. This provision of the constitution is applicable to those cases which suppose a freedom from imprisonment, and ability of payment, and a fraudulent evasion of it. They suppose the case of a man who would pay all his debts, but that from the course of events, if his contracts were literally interpreted and immediately enforced, he would pay too much, if he paid according to its terms. The apology for these laws, which the constitution intended to interdict, was, that he contracted the debt when society was peaceful and prosperous; when land was high; when coin was in circulation; when markets for produce were open, and the whole course

1819.

Sturges
v.
Crownin-
shield.

of commercial intercourse free and unembarrassed; and he was called upon to pay, when every particular, in this state of things, was reversed. In providing a remedy for this terrible fluctuation of affairs after a storm, and the subsidence of the agitated ocean of society into that dangerous calm which always succeeds, the States erred extravagantly: they issued paper money; they set off barren lands, by an arbitrary appraisement, for the payment of debts; they curtailed interest; they made specific articles a tender; they altered the contract as to its facts, its terms, its conditions; they revoked their own grants; they interfered in private concerns— not as they had a right to do, by the equal pressure of a general and permanent system, granting relief to avowed insolvency and distress, but by extending indulgences in particular cases, and arming debtors with privileges against their creditors. In reviewing the history of the period referred to, it will be seen that insolvent laws were complained of by no one as the evil of the times, except by Mr. Hammond, the British minister, in his correspondence with Mr. Jefferson, who indignantly and eloquently repelled the imputation that they were a violation of treaty; and yet the words of the treaty of 1783 were, on a similar subject, stronger and plainer, perhaps, than the words of the constitution: British creditors were to " meet with no lawful impediment to the recovery of the full value of their debts in sterling money."[a] In the debates of the various conventions, no suppo-

[a] *Waite's State Papers*, vol. 1. p. 287.

sition was started, that this clause of the constitution was prohibitory of the accustomed relief to poverty by insolvent laws; and no amendment was offered for the purpose of avoiding this possibly lurking danger, except in the convention of Rhode Island, the last that acted upon the constitution; and there it was rejected, on the ground that the passage of insolvent laws was no where prohibited in the constitution, and that the contrary apprehension was a dream of distempered jealousy. The practice of passing insolvent laws, which had begun so early in colonial times, which had uninterruptedly continued, and was then in daily unblamed operation, was not even referred to as an evil. This is expressive silence—this is a negative argument of conclusive force. They have since been sanctioned by upwards of thirty years' practice; by the absence of all complaint; by the decisions of State and Federal Courts; by the acquiescence of Congress; and, what is more, by the acquiescence of creditors. It has taken upwards of thirty years of curious inspection to discover this occult meaning, covered under the mystical veil of constitutional language. The constitution had reference to those acts which had palpably caused discontent and shame, and were, unfortunately for us, peculiar to our history. To have inserted them in odious detail would have disfigured the constitution, and have eternized a disgrace upon the most brilliant page of our history. Against paper money the Convention had provided. They then guarded against the other expedients of wrong. They did not mean the insertion of an abstract dogma, indefinite in its extent, of

sweeping and dangerous generality. They antici-
pated, that discreet expositors would arrive at their
meaning, from the previous history of the country,
and from the consideration of the well-known evils
which they intended to remedy. For if we were to
give only a technical common law construction to this
article of the constitution, innumerable absurdities
would thicken upon us; we should frequently lose
the benefit, in the plainest case for which it was in-
tended; and be obliged to apply it in others, from
which the instinctive feeling and irresistible common
sense of mankind would repel it. For instance, if we
are to be bound in verbal fetters, what shall we do
with a judgment? The judges of England have de-
clared that a judgment is no contract.[a] What an in-
let this to fraud and evasion! The creditor has merged
his contract in a judgment; but arriving at this point,
he is unprotected by the constitution. What shall we
do with marriage, which is a contract, the most
solemn and sacred of all, by its very terms indissolu-
ble and eternal; but yet the States impair it by di-
vorces *a menso et thoro*, and dissolve it by divorces
*a vinculo matrimonii*. If it impairs the obligation of a
contract for a living insolvent not to pay all his debts,
why is the case altered when he is dead? Can a dif-
ferent rule take effect with regard to his substitute,
his executor or administrator? This would not be
more unreasonable than what is pretended to be done
in the case of the living man, whose contract you make
to be, that he will, at all events, be able to pay; you

[a] Biddleson v. Whytel, 3 *Burr.* 1548.

make it an insurance against accident, against misfortune, against irresistible force, wide-wasting calamity, inevitable necessity; against the decrees and acts of God himself.   Let, then, the rule of interpretation, as to insolvent laws, be the common sense of mankind, the universal agreement of those who have been affected, who may be affected by them.  A whole nation, on such a subject, cannot be in the wrong. The parties contracted with the full knowledge of these laws, and the practice of the States upon them. Every creditor knows he is liable to be paid only so far forth as the property of a distressed debtor, on a legal and bona fide surrender, can pay.  The universal consent of the nation and its public authorities is strongly shown by the practice of Congress itself, whose privileges, it is said, the States are usurping. According to the argument on the other side, Congress, in the only bankrupt law it ever passed, impaired the obligation of contracts, since it made the discharge of the debtor referrable to past as well as future contracts.  Is it, indeed, to be said, that Congress has power to do this, and that the prohibition of this power to the States is an implied permission of it to the United States?  Is a different rule of right and ethics to be applied to these different authorities? Certainly not.  Where, indeed, mere *political* power is prohibited to the States, Congress may exercise that power exclusively.  For instance, Congress may emit bills of credit.  But the matter is different in a *moral* prohibition.  Congress have no more right to impair the obligation of a contract than the States. It is a preposterous presumption, that Congress

meant, by its bankrupt law, to violate the injunction of the constitution, when they left the payment of debts, according to the undeviating course of the civilized world, to be discharged out of the surrendered estate, rather than by the imprisoned person of the debtor. *Communis error facit jus :* In a most important matter in the constitution of this very Court, a coordinate branch of the government, in giving a construction to its own powers and organization, it has chosen to collect an interpretation of the constitution from acts of Congress, from the uninterrupted and unimpeached practice under them, rather than from the bare literal words. The constitution of the United States has said, " there shall be ONE Supreme Court, and such inferior Courts as Congress may, from time to time, ordain and establish. The judges, both of the Supreme and inferior Courts, shall hold their offices during good behaviour," &c. Depending solely on the plain signification of the words, one can hardly conceive of language that establishes, with more distinctness, two separate judicial departments. One Court, existing in unity and supremacy; other Courts multifarious and inferior. One original, the other appellate ; and yet, both Congress and this Court have decided, that it is, at the same time, one and many; inferior and supreme, original and appellate : Nay, more ; that with a commission, which, framed in the words of the constitution, has only reference to one appointment, that, nevertheless, you hold both. But *communis error facit jus ;* and all these apparent inconsistencies were reconciled by the propriety, of acquiescing in a construction of

1819.

Sturges
v.
Crownin-
shield.

Sturges
v.
Crownin-
shield.

the constitution, which had been fixed by a practice under it, for a period of several years.[a]

Mr. *D. B. Ogden*, on the same side, argued, that, supposing the law of New-York in question to be a bankrupt law, there is nothing contained in the constitution of the United States, to prohibit the Legislature of that State from passing such a law. There is no express prohibition to be found in the constitution; and if any prohibition exists, it must be sought for either in the clause giving Congress power " to establish a uniform rule of naturalization, and uniform laws on the subject of bankruptcies throughout the United States," or in the clause which prohibits the States from passing " any *ex post facto* law, or law impairing the obligation of contracts."

1. Does the first clause, which has been mentioned, prohibit the States from passing bankrupt laws? The constitution, after giving certain powers to Congress, in some cases prohibits, by express words, the States from exercising those powers, and in other cases it contains no such prohibition. Why should the Convention insert express prohibitions as to some powers, and not as to all, if it was intended that all should be prohibited? The mention of one in the prohibition is the exclusion of all others, not mentioned, from it. The constitution first declares what powers Congress shall have; and, then, what powers the States shall no longer have. Among the powers thus taken from the States, this of passing bankrupt

a Stuart v. Laird, 1 *Cranch*, 299.

laws is not enumerated. Is it not a fair conclusion from this, that the Convention did not intend to take this power from the States? Would they not have expressly done so, as they did in the case of other powers, where such was their intention? And let it be remembered, that this subject of bankruptcies was brought immediately to the view of the convention in a preceding article, in which the powers of Congress are enumerated. The powers given to Congress by the constitution, may be divided into three classes: *First.* Those which are national in their nature, and which are vested in Congress, as the sovereign power of the nation or Union. *Second.* Those powers which are given to Congress, and from the exercise of which the States are expressly excluded. *Third.* Those which are given to Congress, and from the exercise of which the States are not excluded. Under the *first* class may be enumerated: the power to borrow money on the credit of the United States; to regulate commerce with foreign nations and among the several States; to provide for the punishment of counterfeiting the securities and current coin of the United States; to constitute tribunals inferior to the Supreme Court of the United States; to define and punish piracies and felonies committed on the high seas, and offences against the law of nations; to declare war, grant letters of marque and reprisal, and to make rules concerning captures on land and water; to raise and support armies; to provide and maintain a navy; to provide for organizing, arming, and disciplining the militia, &c. Most of the powers which have been enumerated, could manifestly never

be exercised by the States, because they apply to the Union, for which the legislature of no one State ever could legislate. The remainder of them regard our intercourse with foreign nations, and, therefore, necessarily concern the whole nation collectively, and no one part of it in particular. There was no necessity for the constitution to prohibit the States from exercising these powers, because, from their very nature, they would only be exercised by the general government. *Second.* Those powers, which are given to Congress, and from the exercise of which the States are expressly excluded, are, the power to levy and collect duties and imposts ; to coin money and regulate the value thereof; and to this class might, perhaps, be also added, the powers to raise armies and maintain a navy, which have been before stated in the first class of powers, but from the exercise of which the States are in terms prohibited in time of peace. Under the *third* class of powers, or those which are given to Congress, and from the exercise of which the States are not precluded, are the powers to levy and collect taxes and excises; to establish a uniform rule of naturalization, and uniform laws upon the subject of bankruptcies throughout the United States; to regulate the value of foreign coins, and fix the standard of weights and measures ; to establish post offices and post roads ; to promote the progress of science and useful arts, by securing, for limited times, to authors and inventors, the exclusive right to their writings and discoveries. From the exercise of any of these powers, the States are neither expressly, nor by any

fair rule of construction, excluded. To levy and col-
lect taxes and excises, is a power given to Congress.
Is it taken from the individual States? If it were, the
State governments must have expired at the mo-
ment the general government came into existence.
Without the power of levying and collecting taxes, no
government can exist. If this power to levy and col-
lect taxes and excises, which is given to Congress,
be not an exclusive power, why should the others be
so? Every argument which has been used, applies
with equal force to this, as to the other powers. The
power is expressly given to Congress, and if it be
true, as it has been contended, that every power
given to Congress is necessarily exclusive, this must
be so; and if it be not exclusive, there is nothing in
the argument of the counsel for the plaintiff. But it
may be asked, do then the government of the United
States, and of the individual States, both possess
these powers? And have they a concurrent right to
exercise them? We answer, that they have a concur-
rent power on the subjects; they may both legislate
in any of this class of powers. Congress and the
individual States may both tax the same article of
property, and both taxes must be paid. Congress
has passed laws imposing a land tax: was it ever
supposed, that their exercising that power necessarily
took from the State legislatures their right of exer-
cising it? Congress has power to establish a uni-
form rule of naturalization: is this an exclusive
power? The power of admitting foreigners to the
rights and privileges of natural born citizens, was a
right which had been exercised by every State in the

1819.

Sturges
v.
Crownin-
shield.

Union, from the date of their Independence down to the adoption of the Federal Constitution. With a large portion of their territory uncultivated, and uninhabited, except by savages, the power and right of encouraging the emigration of foreigners had become a sort of common law of the country; it originated with our fathers, when they first settled in the country, and had continued ever since; it formed a prominent feature in the system of laws in every State in the Union. Suppose Congress had never thought proper to exercise the power given to it, of establishing a uniform rule of naturalization; was it intended by the Convention, that the States should no longer exercise that power, and that the omission of Congress to legislate on the subject, should operate as a bar to the admission of foreigners to the rights and privileges of citizens, and thus put an end to emigration? The first act of Congress, entitled, " An act to establish a uniform rule of naturalization," was passed in March, 1790, and prescribed the mode in which a foreigner might become a citizen of the United States; but it did not declare that the mode therein prescribed should be uniform throughout the United States, and that no State should thereafter admit foreigners to the rights of citizenship. After the passage of this law, some of the States, Virginia and Pennsylvania, the former certainly, and it is believed the latter, continued to exercise this power of naturalization until January, 1795, when Congress passed an act, entitled, " An act to establish a uniform rule of naturalization, and to repeal the act heretofore passed on that subject ;"

1819.

Sturges
v.
Crownin-
shield.

which act, for the purpose " of carrying into com-
plete effect the power given by the constitution to
establish a uniform rule of naturalization through-
out the United States," declares, that any alien may
be admitted to become a citizen of the United States,
*or any of them,* upon the conditions contained in the
said act, " *and not otherwise.*" After Congress had
thus legislated upon the subject, and had established,
what by the constitution it had a right to establish,
a *uniform* system of naturalization, no State could
legislate, and none ever attempted to legislate, on
the subject. Wherever a power is exercised by
Congress, and there is nothing incompatible in its
exercise by the States, they may both exercise it,
and the laws passed by both are binding and consti-
tutional. If Congress has a power, and exercises it
in such a way that the exercise of the same power
by the individual States would be incompatible with
its exercise by Congress, then the State law must give
way; it must yield to the law of Congress: not because
the law of the State is unconstitutional, and, therefore,
void, but because the power of Congress is supreme,
and where the State laws interfere with it they must
yield. The 6th article of the constitution declares,
that " this constitution, and the laws of the United
States, which shall be made in pursuance thereof,
and all treaties made, or which shall be made, under
the authority of the United States, shall be the su-
preme law of the land ; and the judges in every State
shall be bound thereby, any thing in the constitution
or laws of any state to the contrary notwithstand-
ing." From this clause the Convention evidently

supposed that the laws of the United States, and of the individual States, might, in some cases, conflict with each other, (which they never could do, if they could never legislate upon the same subject,) and meant to provide, when they did conflict, that the State laws should yield, and the laws of the United States be supreme. But until Congress does legislate, and in such a way as to preclude the States, the States retain their power to legislate, on the class of cases we are now considering. Congress has power to fix the value of foreign coins. If it had never legislated upon that subject, were the States prohibited from fixing the value of foreign coins? Congress has power to fix a standard of weights and measures. If it should never exercise that power, were the individual States to be left without any standard of weights and measures? But it is said, that an act of legislation is an act of the sovereign authority of the society, and that it would be a strange act of sovereign authority, whose power can be put an end to whenever Congress choose to legislate, and is to revive again when Congress choose no longer to legislate. This is said to be an anomaly in political science, and absurd upon the face of it. But we ask, whether our whole form of government is not new and unheard of, until established here? Is not our constitution an anomaly? Is it, therefore, not to be executed? To a person unacquainted with the nature, power, and extent of our political institutions, before and at the time the constitution of the United States was formed and established, many parts of it would be wholly unintelligible, and no proper construction could be given to

1819.

Sturges
v.
Crownin-
shield.

it, without bearing in mind the political condition of the people who ordained and established it. Citizens of separate and independent governments, they adopted this constitution, not because they had no government, but because they had several governments ; to secure to themselves those blessings of peace and independence which they had earned by their common sufferings, and which were the reward of their common blood and treasure. Fearing the approaches of those petty jealousies, which are always engendered in petty states, and which might soon array against each other those arms, which had been so lately united against the common enemy, they established this constitution. It is without example ; and it is no argument against it, to say, that the powers vested by it in Congress, and left by it in the several States, are novelties. If the construction, for which we contend, be given to it, there is perfect harmony in all its parts. But another argument has been stated, and urged with some earnestness against us, which is founded upon the declaration in the constitution, that the rule of naturalization and the laws of bankruptcy are to be *uniform* throughout the United States. The argument is this: the constitution says, the system of bankruptcy shall be *uniform* throughout the United States. If the several States have power to legislate on the subject, the systems would be *multiform* ; it is, therefore, evident, that the Convention intended that Congress should alone have the power of establishing the system of bankruptcy, and that the States were to be excluded from the exercise of any such power. Now, if there be any solidity in this argu-

ment, it would prove, that whenever the Convention declares that any laws passed by Congress *shall* be uniform throughout the United States, the power of passing such laws is necessarily exclusive. But Congress has the power of levying and collecting *duties, imposts,* and *excises;* and the Convention declares, that " all duties, imposts, and excises shall be uniform throughout the United States ;" and yet it never has been contended that this power is exclusive. As to *excises,* many, and, it is believed, most of the States, have always exercised, and still do exercise, the power of levying and collecting excises. And so far was the Convention from considering the power given to Congress to levy and collect duties, imposts, and excises, as an exclusive power, because they were to be *uniform,* that in the next article of the constitution the States are, in express words, prohibited from levying and collecting *imposts* and *duties.* Why was this prohibition inserted, if the States were already prohibited from the exercise of that power ? If the power of establishing *uniform* laws as to duties, imposts, and excises, vests no exclusive power in Congress, in relation to those subjects, why should the power of establishing *uniform* laws of bankruptcy and naturalization exclude the States from the exercise of those powers? It has been said, that every power given to Congress is necessarily exclusive and unlimited, unless it be expressly limited in the constitution ; or unless, from the power itself, it is necessarily a limited power. If this be true, then it follows, that if the constitution had given power to Congress to pass a law establishing a rule of naturaliza-

1819.

Sturges
v.
Crownin-
shield.

tion, and a system of bankruptcy, the power would have been exclusive, and the States would have retained no power to legislate on those subjects. Why, then, was it thought necessary by the Convention, to declare that the laws upon these subjects should be *uniform?* Not because the power was to be an exclusive one, but because, as each State retained the power of legislation upon these subjects, a variety of laws and systems might, and necessarily would be, introduced, which might and probably would have an effect upon the general commerce of the country, and be attended with consequences unfavourable to the general welfare and prosperity; and, therefore, power was given to Congress, whenever they thought proper, to put an end to these various and discordant systems, by establishing one uniform system, to pervade the whole United States. So far, therefore, from the insertion of the word *uniform*, in this clause of the constitution, affording any argument in favour of the exclusive power of Congress to make laws upon the subject of bankruptcies and naturalization, it was the existence and probable exercise of the power of the States to legislate upon those subjects, which induced the Convention to give power to Congress to establish a *uniform* system throughout the United States. A system of bankruptcy is the creature of commerce ; its end and its object are at once to give and support commercial credit. Some of the United States are, from their situation, habits, and pursuits, commercial : others are agricultural. To the one, a system of bankruptcy may be very convenient, if not essential ; to the other, such a system may not only

be unnecessary, but ruinous. Hence the difficulty which was foreseen, and is now felt, of establishing any uniform system, to pervade the Union, and hence would have been the manifest impropriety of taking from the States all power of legislating upon the subject, and vesting that power exclusively in Congress. It is said, that as Congress has the power to legislate upon this subject of bankruptcies, and omits to exercise it, it is an expression of the opinion of Congress, that no such system ought to exist. The omission of Congress to legislate, amounts to a declaration, that they do not think a *uniform* system is necessary; and they, therefore, leave the States to legislate upon the subject, whenever they may think it proper and expedient to do so. That Congress considers the States as possessing this power is evident, from the 61st section of the bankrupt law of 1800.

2. The second question is, whether this law of New-York is repugnant to that clause of the constitution which prohibits the States " from passing any *ex post facto* law, or law impairing the obligation of contracts?" We have already endeavoured to show, that the individual States have the power of passing *bankrupt* laws. What is a *bankrupt* law? It is a statute which, upon a surrender of the property of the bankrupt, discharges both his person and his future acquired property from the payment of his debts. This discharge from all future liability is one of the principal objects in all bankrupt laws, which, for the benefit of the creditors, provide by heavy penalties, for a fair and full surrender of the debtor's property; and

and for the benefit of the unfortunate debtor and his
family, leaves him to the full enjoyment of whatever
his talents and industry may enable him to earn for
the future advancement of himself and family. If,
then, the constitution recognizes the right and power
of the States to pass bankrupt laws, it seems to fol-
low, that the clause of the constitution, which prohi-
bits the States from passing laws impairing the obli-
gation of contracts, does not include a prohibition to
pass bankrupt laws.   Whether this law of the State
of New-York is to be considered as an insolvent law
or a bankrupt law, it is unnecessary for us to inquire;
because, though great pains have been taken to prove
that it is a bankrupt law, we do not think it neces-
sary to show that it is not.  If it be a bankrupt law,
the State had a right to pass it.  If it be an insolvent
law, it is equally within the scope of our reasoning;
because, if an insolvent law, which discharges the
person and future property of the insolvent, be a law
impairing the obligation of a contract, within the
meaning of the constitution, so is a bankrupt law,
which does the same thing.   But we have shown
that the States have the power of passing bankrupt
laws.  They have, therefore, the power to declare
that an unfortunate debtor, upon the compliance with
certain conditions, shall be discharged from all lia-
bility to the payment of his debts; unless, indeed, it
can be supposed that the Convention intended to leave
to the States the power of passing a bankrupt law,
and yet, intended to deprive them of the power of in-
corporating into that law a provision, without which
no system of bankruptcy could exist.  Is a bank-

rupt law a law impairing the obligation of contracts, within the meaning of the constitution? We insist, that a bankrupt law, so far from being considered as a law impairing the obligation of contracts, ought to be regarded as a mode of enforcing the performance of contracts. The *first* object of a bankrupt system is to enforce and secure the rights of creditors, to save them from the consequences of fraudulent and secret conveyances of the debtors; and to give them the benefit of all the debtor's property, and thus compelling the debtor, as far as he is able, to pay his debts and perform his contracts. It acknowledges the existence of the contract; and the binding force of the contract is the very ground upon which it proceeds. Insolvent laws, and insolvent laws discharging as well the person as the future acquisitions of a debtor, from the payment of his debts, had been passed by many of the States, both before and after the revolution, and many of them were in force when the constitution was adopted. The nature and existence of these laws was well known to the Convention, in which were some of the greatest lawyers in the country. If they had intended to deprive the States of this power, so long exercised, and so well understood, would they not have expressed that intention in direct terms, instead of leaving it to be inferred from words of doubtful import? or can it be contended that the Convention intended that the States, by construction, should be deprived of their power, and were afraid to deprive them of it by express words, for fear that if such deprivation was understood by the States, they would not consent to it?

1819.

Sturges

v.

Crownin-
shield.

No such motive can or ought to be attributed to the Convention : and if not, then it is inconceivable that they should not have expressly included *insolvent laws* in the prohibition, if they had intended they should be included in it.   It has already been shown that Congress has acted upon the supposition, that the States were not deprived of the power in question.   What then, it will be asked, did the Convention mean by prohibiting the States from passing a law impairing the obligation of contracts?   We answer, that they meant to include in their prohibition all those unusual, and perhaps unwise laws, which the exigencies of the times had originated; which the distress and difficulties of the revolution seemed to have rendered necessary, protecting individuals from the payment of their just debts, either by allowing them to make a deduction from the amount of interest due on them, by protracting the payment, or by permitting them to withhold their property from their creditors.   They meant to put a check upon the sovereign authority of the States themselves, by preventing them from breaking their own contracts, from revoking their own grants, and violating the chartered rights of corporations.   In short, they meant to suppress all those interferences with private rights, which are not within the proper province of legislation, the evils of which had been felt in an uncommon degree in this country.   But they did not mean to repeal all those laws, or to prevent the enactment of other similar laws, which have existed in every civilized age and country, for the protection of unfortunate debtors, and the punishment of

1819.

Sturges
v.
Crownin-
shield.

frauds upon creditors; which do not impair the obligation of contracts, but enforce it in the only mode the nature of things will permit; and which Congress itself has the power, though not the exclusive power of passing.

Mr. *Hopkinson*, for the plaintiff, in reply, insisted, that the construction of the constitution contended for by the defendant's counsel was fallacious; and even if sound, would be insufficient for their purpose. That the power of passing uniform laws on the subject of bankruptcies, was, from its very nature, a national power; and must, therefore, even according to the opposite argument, be exclusively vested in the national government. That the power of passing naturalization laws is exclusively vested in Congress has already been determined by the Court.[a] Yet both this, and the power of legislating on the subject of bankruptcies, are contained in the same clause, and expressed in similar terms; and it is argued, on the other side, that the interpretation must be the same as to both. It is also said, that the power of Congress to pass *uniform* laws on the subject of bankruptcies is consistent with the States passing laws to operate until Congress act upon the same subject. But we give a different interpretation to the word *uniform*. When the constitution declares, that " Congress shall have power to pass uniform laws," it implies that none but uniform laws shall exist: that Congress alone shall establish a bankrupt system, and that this system shall be *uni-*

*d* Chirac v. Chirac, 2 *Wheat.* 259.

*form.* One of the principal motives for adopting the constitution was to raise the credit of the country, by establishing a national government with adequate powers to redress the grievances of foreigners, instead of compelling them to rely upon the capricious and contradictory legislation of the several States. The laws on the subject of bankruptcies, from their very nature, ought to be the same throughout the Union. A merchant has seldom all his creditors confined to one place or State; and a discharge, local in its nature, gives rise to various intricate questions of the *lex loci contractus*, the difficulties of which are all avoided by uniformity in the laws. It is impossible to maintain that this law of New-York, or any other State bankrupt law, can be limited in its operation to the State where it is passed. If it be constitutional, it must operate extra-territorially, so far as it may, consistently with the principles of universal law. Nor is the power of Congress confined to the enacting of a bankrupt law *between* the States. This power, like all the other powers of the national government, operates directly and universally upon all the citizens of the Union. The 61st section of the bankrupt law of 1800, c. 173. gives nothing to the States which they did not before possess. If it intended to recognize in them an authority not reserved by the constitution, it was ineffectual for such a purpose. Congress could not give them what the constitution had not given them; nor does the silence of Congress on the subject, since the act of 1800 was repealed, manifest the opinion of that body that there should be various laws on the subject throughout the

Union : it only shows, that Congress has deemed it expedient that there should be no law on the subject. If such have hitherto been the views of Congress, although we may suppose them to be mistaken views, in what other mode could they be made known but by silence—by omitting to do what, perhaps, wiser views might induce Congress to do ? The only other mode in which Congress could secure the country against the evils of numerous and inconsistent bankrupt laws, would be by establishing a uniform bankrupt law; against its own opinions and judgment. If the States have the power contended for, when Congress does not exercise the authority vested in it, then Congress must keep up a *continual claim,* by maintaining at all times a bankrupt system which it thinks inexpedient, for the purpose of preventing the evils and confusion that spring from various laws on such a subject. But we believe that the Convention expected that Congress would exercise the power, and in that way a bankrupt system would be produced. But still this is left to the discretion of Congress, and to that body must such considerations be addressed, since it is evident that the individual States cannot produce a uniform system by their separate laws. That the law of New-York in question is a bankrupt law, or a law on the subject of bankruptcies, there can be no doubt. It has the distinguishing feature of a bankrupt law. It discharges the party from the obligation of the debt entirely ; whilst an insolvent law discharges only his person from imprisonment. Such is the distinction in England between the permanent bankrupt system, and

the insolvent laws which are occasionally passed, (commonly called the Lords' acts,) for the relief of debtors; as to the imprisonment of their persons, upon their making an assignment of all their property for the benefit of their creditors. The same distinction prevails on the continent of Europe, between the bankrupt system, which discharges both the person and future property, and the *cessio bonorum*, which discharges the person only, leaving the future acquisitions of property liable for the debt. If this law of New-York were an insolvent law, it might co-exist with a uniform bankrupt code: but the provisions of this law are such that it cannot co-exist with a uniform system of bankruptcy. It, therefore, follows, that it is a bankrupt law in the sense of the constitution. If the power of making laws on the subject of bankruptcies be exclusive, its nature, as such, was irrevocably fixed at the establishment of the new constitution. On the other hand, if it be a concurrent power, it has always been, and must always be, concurrent. There is nothing contingent in it ; nor can it shift and alternate. But whether this be a bankrupt or an insolvent law, and whether the power of passing bankrupt laws be exclusive or concurrent, we insist that this law is repugnant to the constitution, as being a law impairing the obligation of contracts. It has been urged that parties contracting in a State where a bankrupt law is in force, make their contract with a view to that law, so that the law makes a part of the contract. But this is assuming the law to be constitutional ; for if it be unconstitutional, it is a void law, as being re-

pugnant to the supreme law : and parties cannot be presumed to contract with a view to acts of the local legislature, which, though clothed with the forms of law, are nullities, so far as they attempt to impair the obligation of contracts. The idea of a contract made with reference to a law which impairs the obligation of contracts, is absurd and incomprehensible. The constitution was intended to secure the inviolability of contracts according to the immutable principles of justice. To restrict the operation of the clause of the constitution which prohibits the States from making any law impairing the obligation of contracts, to laws affecting contracts existing at the time the law is passed, would be to confine the operation of this salutary prohibition within very narrow limits. · Is it credible that the Convention meant to prohibit the States from making laws impairing the obligation of past contracts, and to leave them free to impair the obligation of future contracts ? The prohibition against thus impairing existing rights of property, would have been almost superfluous, since the principles of universal jurisprudence had already prohibited such retrospective legislation upon vested rights." But the terms of the prohibition are adapted to include both prospective and retrospective laws impairing the obligation of contracts. Suppose a State should enact a law providing that any debt, which might thereafter be contracted, should be discharged, upon payment by the debtor of half the amount. This law would be

*a* Vide *ante, p.* 134.

manifestly repugnant to the constitution: nor could it be said that the creditor would be bound by this law, because it was in existence at the time when the contract was made; since the obligation of the contract is guaranteed by the constitution, which is the supreme law. Such a State law would not have the binding force of the *lex loci contractus,* as between citizens of different States; because, being repugnant to the constitution of the United States, it is, in effect, no law. Nor would it be obligatory between citizens of the same State, as a domestic regulation; because all the citizens of the United States are entitled to the benefit of this clause of the constitution, which was not meant merely to protect the citizens of one State from the injustice of the government of another, but to guarantee to the whole people of the Union the inviolability of contracts by the State legislatures. It was not intended to have an internal or federal operation merely, but to act, like all the other sanctions of the constitution, directly upon the whole body of the nation. The operation of this law, and of all laws which discharge the debt as well as the person of the debtor, is to compel the creditor to release his debt upon receiving a dividend which may be less than his demand, or even without any dividend, if the bankrupt's estate will not yield one. The obligation of the contract is as much impaired as if the law had provided in terms that the debtor should be discharged from the debt by paying half, or any other proportion, of the sum due; or that he should be discharged without paying any part of the debt. The law, in this

case, not only *impairs*, but it *annuls*, the obligation of the contract—*vi legis abolitum est*.  But will it be pretended, that the States have a right to pass laws for the abolition of debts, even if such laws have only a prospective operation ?  Or can it be supposed that they have authority to pass instalment or suspension laws, (which are contended, by the defendant's counsel, to be the evil meant to be guarded against by the constitutional prohibition,) provided such laws are only applied to contracts made subsequent to the passage of the laws ?  During the pressure of the late war, the legislature of the State of North Carolina passed an act providing that any Court rendering judgment against a debtor for debt or damages, between the 31st of December, 1812, and the 1st of February, 1814, should stay the execution until the first term of the Court after the last mentioned day, upon the defendant's giving two freeholders as sureties for the debt.  The Supreme Court of North Carolina determined the act to be unconstitutional, upon the ground of its impairing the obligation of contracts.  Though it is not of binding authority as a precedent, the principles of this decision are strongly applicable to the present case.[a]  But we insist, in the case now before the Court, that

<hr/>

a Crittenden v. Jones, 5 *Hall's Am. Law. Journ.* 520.  In this case the Court says, " whatever law relieves one party from any article of a stipulation, voluntarily and legally entered into by him with another, without the direct assent of the latter, impairs its obligation ; because the rights of the creditor are thereby destroyed, and these are ever correspondent to, and co-extensive with, the duty of the debtor."

even admitting the act now in question to be constitutional as to all contracts made *after* it was passed, it is clearly repugnant to the constitution as to all contracts *previously* made, as it is a law impairing the obligation of those contracts. It is, however, said that this law does not impair the obligation of the contracts, but merely deprives the creditor of the usual means of enforcing it; since it may be revived by a new promise, for which the moral obligation, which is still left, is a sufficient consideration. But it cannot be conceived that the constitution meant to prohibit the passage of laws impairing the *moral* obligation of contracts, since this obligation can only be enforced in *foro conscientiæ*, and it depends solely upon the volition of the party, whether he will make that new promise which is necessary to revive the debt. The legal obligation being gone forever, unless the party chooses to revive it, it is not only *impaired*, but absolutely extinguished and destroyed. It does not require, as in the case of a debt barred by the statute of limitations, a mere slight acknowledgment that the debt has not been paid or satisfied: but an express promise is indispensably necessary to revive a debt barred by a bankrupt certificate, which does not proceed on the presumption of payment; but, on the contrary, supposes the debt not to have been satisfied, and absolves the debtor expressly from the performance of his contract, The present inability of the debtor to perform his contract, arising from poverty, is indeed the motive or ground of the legislative interference to dispense with its performance; but this ground is taken away when that inability

ceases; and it can only justify the discharge of his person from arrest and imprisonment, but cannot authorize the discharge of his future acquisitions of property. Such a discharge impairs all that remains of the obligation of the contract. If the right of coercing the debtor by imprisonment is taken away; if his property, assigned for the benefit of his creditors, is not sufficient to pay all his debts; and if the property which he may afterwards acquire, of whatever nature, or by whatever title, is not liable for his debts; surely the obligation of the contract is impaired. If its terms and conditions are not changed, they remain unperformed; which is the same thing to the creditor. If the time of performance is not enlarged, the obligation of performance is entirely dispensed with; which is a still greater infringement of his rights. It is said that imprisonment for debt is not a common law remedy for the non-performance of contracts, and makes no part of their obligation. Be it so: but the responsibility of the debtor as to his property, is coeval with the common law, and exists also in every other system of jurisprudence. It is the fund to which the creditor has a natural right to resort for payment. The liability of the person of the debtor to arrest and imprisonment may be modified, changed, or entirely taken away, according to the discretion of the local legislature. It has been in all ages and countries subjected to the sovereign discretion of the legislative will; and has been permitted, in various degrees, from the extreme severity of the Roman jurisprudence, which gave the creditor an absolute power over the liberty, and even life,

of his debtor, to the mild system which prevails on the continent of Europe, which confines imprisonment for debt to commercial contracts and cases of fraud or breach of trust. It has also been urged, that the same reasoning which tends to establish the position, that the obligation of contracts is impaired by bankrupt laws, would extend to statutes of limitation, which make an essential part of the jurisprudence of every State. We answer, that there is a material distinction between statutes of limitation and bankrupt laws. A law of limitations, or prescription, does not strike at the validity of the contract. It is of the remedy, and not of the essence or obligation of the contract. It is a mere rule of evidence; and is founded on the presumption, arising from the lapse of time, that the debt has been paid or satisfied. This legal presumption may be negatived by positive evidence. It is not a *presumptio juris et de jure*, which is conclusive, and cannot be contradicted; for it may be repelled by any, the slightest evidence, amounting to an admission that the debt has not been paid, even though that admission be qualified by the declaration of the party that he means to insist upon the statute. The statute may also be prevented from running, and the demand perpetuated by the act of the creditor himself. It is a rule of evidence, or legal presumption, which is incorporated into every system of jurisprudence independent of positive institution. It was a part of the civil law, and is still a part of the common law. It is adopted by Courts of Equity, by analogy, from the statute of limitations. The particular length of

time which shall bar the right of action, is indeed prescribed in some cases by the legislature; and if the period of limitation were to be arbitrarily altered by the legislature, so as to take away vested rights under contracts existing at the time the law was passed, the law would be so far unconstitutional: not that the constitutional prohibition is in general confined to existing contracts; but because, in this particular case, a new rule of evidence or legal presumption could not justly be applied to deprive the parties of rights already acquired under the old rule. The same principle applies to laws for altering the rate of interest. They cannot have a retrospective operation. But, generally speaking, " the constitution could not have an eye to such details, so long as contracts were submitted without legislative interference to the ordinary and regular course of justice, and the existing remedies were preserved in substance, and with integrity."[a] But this bankrupt law is not a mere matter of detail, and a part of the *lex fori*; it is a legislative interference with the ordinary and regular course of justice; and the existing remedies, so far from being preserved in substance, and with integrity, are entirely abolished. It is incredible that the Convention intended to provide against such evils as suspension or instalment laws, and to leave untouched the much greater evils of local bankrupt laws of this character. In truth, the framers of the constitution did not mean to limit their prohibition to any particular description of legislative acts. They

---

*a Per* Mr. Justice (now Chancellor) KENT, in Holmes v. Lansing, 3 *Johns. Cas.* 73.

meant to incorporate into the constitution a provident principle which should apply to every possible case that might arise. The inviolability of contracts from State legislation, is guaranteed by the Union to all its citizens. But, it is said, that this prohibition is of a *moral*, as well as *legal* nature ; and is equally binding upon Congress, as upon the State legislatures, though Congress is not expressly mentioned in the prohibition : that, consequently, if a bankrupt law be a law impairing the obligation of contracts, Congress ought no more to assume the right of passing such a law than the States. The answer to this objection is, that Congress is expressly vested with the power of passing bankrupt laws, and is not prohibited from passing laws impairing the obligation of contracts, and may, consequently, pass a bankrupt law which does impair it; whilst the States have not reserved the power of passing bankrupt laws, and are expressly prohibited from passing laws impairing the obligation of contracts.[a]

Mr. Chief Justice MARSHALL delivered the opinion of the Court. This case is adjourned from the Court of the United States, for the first circuit and the district of Massachusetts, on several points on which the judges of that Court were divided, which are stated

1819.

Sturges
v.
Crownin-
shield.

Feb. 17th.

---

a This case was elaborately argued in the Circuit Court, by Mr. Saltonstall for the plaintiff, upon the same grounds and principles as were maintained in this Court. The reporter has been favoured with the perusal of a note of his instructive and able argument, which, as the case was not decided in the Court below, does not appear in Mr. Mason's reports.

1819.

Stürges
v.
Crownin-
shield.

Since the a-
doption of the
constitution of
the U. States,
a State has au-
thority to pass
a bankrupt
law, provided
such law does
not impair the
obligation of
contracts with-
in the meaning
of the 10th sec.
of the 1st art.
of the consti-
tution, and
provided there
be no act of
Congress in
force to esta-
blish a uniform
system of bank-
ruptcy con-
flicting with
such law.

in the record for the opinion of this Court. The first is,

Whether, since the adoption of the constitution of the United States, any State has authority to pass a bankrupt law, or whether the power is exclusively vested in the Congress of the United States?

This question depends on the following clause, in the 8th section of the 1st article of the constitution of the United States.

" The Congress shall have power," &c. to " establish a uniform rule of naturalization, and uniform laws on the subject of bankruptcies throughout the United States."

The counsel for the plaintiff contend, that the grant of this power to Congress, without limitation, takes it entirely from the several States.

In support of this proposition they argue, that every power given to Congress is necessarily supreme; and, if, from its nature, or from the words of grant, it is apparently intended to be exclusive, it is as much so as if the States were expressly forbidden to exercise it.

These propositions have been enforced and illus-trated by many arguments, drawn from different parts of the constitution. That the power is both unlimit-ed and supreme, is not questioned. That it is exclu-sive, is denied by the counsel for the defendant.

In considering this question, it must be recollected that, previous to the formation of the new constitu-tion, we were divided into independent States, united for some purposes, but, in most respects, sovereign. These States could exercise almost every legislative power, and, among others, that of passing bankrupt

laws. When the American people created a national legislature, with certain enumerated powers, it was neither necessary nor proper to define the powers retained by the States. These powers proceed, not from the people of America, but from the people of the several States; and remain, after the adoption of the constitution, what they were before, except so far as they may be abridged by that instrument. In some instances, as in making treaties, we find an express prohibition; and this shows the sense of the Convention to have been, that the mere grant of a power to Congress, did not imply a prohibition on the States to exercise the same power. But it has never been supposed, that this concurrent power of legislation extended to every possible case in which its exercise by the States has not been expressly prohibited. The confusion resulting from such a practice would be endless. The principle laid *down by the* counsel for the plaintiff, in this respect, is undoubtedly correct. Whenever the terms in which a power is granted to Congress, or the nature of the power, require that it should be exercised exclusively by Congress, the subject is as completely taken from the State Legislatures, as if they had been expressly forbidden to act on it.

Is the power to establish uniform laws on the subject of bankruptcies, throughout the United States, of this description?

The peculiar terms of the grant certainly deserve notice. Congress is not authorized merely to pass laws, the operation of which shall be uniform, but to *establish* uniform laws on the subject throughout the

1819.

Sturges
v.
Crownin-
shield.

Whenever the terms in which a power is granted. by the constitution to Congress, or whenever the nature of the power itself, require that it should be exercised exclusively by Congress, the subject is as completely taken away from the State legislatures, as if they had been expressly forbidden to act on it.

The power granted to Congress, of establishing uniform laws on the subject of bankruptcies, is not of this description.

United States.   This *establishment* of *uniformity* is, perhaps, incompatible with State legislation, on that part of the subject to which the acts of Congress may extend.   But the subject is divisible in its nature into bankrupt and insolvent laws; though the line of partition between them is not so distinctly marked as to enable any person to say, with positive precision, what belongs exclusively to the one, and not to the other class of laws.   It is said, for example, that laws which merely liberate the person are insolvent laws, and those which discharge the contract, are bankrupt laws.   But if an act of Congress should discharge the person of the bankrupt, and leave his future acquisitions liable to his creditors, we should feel much hesitation in saying that this was an insolvent, not a bankrupt act; and, therefore, unconstitutional. Another distinction has been stated, and has been uniformly observed.   Insolvent laws operate at the instance of an imprisoned debtor; bankrupt laws at the instance of a creditor.   But should an act of Congress authorize a commission of bankruptcy to issue on the application of a debtor, a Court would scarcely be warranted in saying, that the law was unconstitutional, and the commission a nullity.

When laws of each description may be passed by the same Legislature, it is unnecessary to draw a precise line between them.   The difficulty can arise only in our complex system, where the Legislature of the Union possesses the power of enacting bankrupt laws; and those of the States, the power of enacting insolvent laws.   If it be determined that they are not laws of the same character, but are as distinct as bankrupt laws and laws which regulate the course of descents,

a distinct line of separation must be drawn, and the power of each government marked with precision. But all perceive that this line must be in a great degree arbitrary. Although the two systems have existed apart from each other, there is such a connection between them as to render it difficult to say how far they may be blended together. The bankrupt law is said to grow out of the exigencies of commerce, and to be applicable solely to traders; but it is not easy to say who must be excluded from, or may be included within, this description. It is, like every other part of the subject, one on which the Legislature may exercise an extensive discretion.

This difficulty of discriminating with any accuracy between insolvent and bankrupt laws, would lead to the opinion, that a bankrupt law may contain those regulations which are generally found in insolvent laws; and that an insolvent law may contain those which are common to a bankrupt law. If this be correct, it is obvious that much inconvenience would result from that construction of the constitution, which should deny to the State Legislatures the power of acting on this subject, in consequence of the grant to Congress. It may be thought more convenient, that much of it should be regulated by State legislation, and Congress may purposely omit to provide for many cases to which their power extends. It does not appear to be a violent construction of the constitution, and is certainly a convenient one, to consider the power of the States as existing over such cases as the laws of the Union may not reach. But be this as it may, the power granted to Congress may be exer-

-1819.

Sturges
v.
Crownin-
shield.

cised or declined, as the wisdom of that body shall decide. If, in the opinion of Congress, uniform laws concerning bankruptcies ought not to be established, it does not follow that partial laws may not exist, or that State legislation on the subject must cease. It is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the States. It is not the right to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts of the States.

The right of the States to pass bankrupt laws is not extinguished by the enactment of a uniform bankrupt law throughout the Union by Congress; it is only suspended, so far as the two laws conflict.

It has been said, that Congress has exercised this power; and, by doing so, has extinguished the power of the States, which cannot be revived by repealing the law of Congress.

We do not think so. If the right of the States to pass a bankrupt law is not taken away by the mere grant of that power to Congress, it cannot be extinguished; it can only be suspended, by the enactment of a general bankrupt law. The repeal of that law cannot, it is true, confer the power on the States; but it removes a disability to its exercise, which was created by the act of Congress.

Without entering farther into the delicate inquiry respecting the precise limitations which the several grants of power to Congress, contained in the constitution, may impose on the State Legislatures, than is necessary for the decision of the question before the Court, it is sufficient to say, that until the power to pass uniform laws on the subject of bankruptcies be exercised by Congress, the States are not forbidden to pass a bankrupt law, provided it contain no prin-

ciple which violates the 10th section of the first article of the constitution of the United States.

This opinion renders it totally unnecessary to consider the question whether the law of New-York is, or is not, a bankrupt law.

We proceed to the great question on which the cause must depend. Does the law of New-York, which is pleaded in this case, impair the obligation of contracts, within the meaning of the constitution of the United States?

This act liberates the person of the debtor, and discharges him from all liability for any debt previously contracted, on his surrendering his property in the manner it prescribes.

In discussing the question whether a State is prohibited from passing such a law as this, our first inquiry is into the meaning of words in common use, What is the obligation of a contract? and what will impair it?

*What is the obligation of a contract? And what will impair it?*

It would seem difficult to substitute words which are more intelligible, or less liable to misconstruction, than those which are to be explained. A contract is an agreement in which a party undertakes to do, or not to do, a particular thing. The law binds him to perform his undertaking, and this is, of course, the obligation of his contract. In the case at bar, the defendant has given his promissory note to pay the plaintiff a sum of money on or before a certain day. The contract binds him to pay that sum on that day; and this is its obligation. Any law which releases a part of this obligation, must, in the literal sense of the word, impair it. Much more must a

law impair it which makes it totally invalid, and entirely discharges it.

The words of the constitution, then, are express, and incapable of being misunderstood. They admit of no variety of construction, and are acknowledged to apply to that species of contract, an engagement between man and man for the payment of money, which has been entered into by these parties. Yet the opinion that this law is not within the prohibition of the constitution has been entertained by those who are entitled to great respect, and has been supported by arguments which deserve to be seriously considered.

It has been contended, that as a contract can only bind a man to pay to the full extent of his property, it is an implied condition that he may be discharged on surrendering the whole of it.

But it is not true that the parties have in view only the property in possession when the contract is formed, or that its obligation does not extend to future acquisitions. Industry, talents, and integrity, constitute a fund which is as confidently trusted as property itself. Future acquisitions are, therefore, liable for contracts; and to release them from this liability impairs their obligation.

*The obligation of a contract is not fulfilled by a cessio bonorum. The parties have not merely in view the property in possession when the contract is formed, but its obligation extends to future acquisitions.*

It has been argued, that the States are not prohibited from passing bankrupt laws, and that the essential principle of such laws is to discharge the bankrupt from all past obligations; that the States have been in the constant practice of passing insolvent laws, such as that of New-York, and if the framers of the constitution had intended to deprive them of this

power, insolvent laws would have been mentioned in the prohibition; that the prevailing evil of the times, which produced this clause in the constitution, was the practice of emitting paper money, of making property which was useless to the creditor a discharge of his debt, and of changing the time of payment by authorizing distant instalments. Laws of this description, not insolvent laws, constituted, it is said, the mischief to be remedied; and laws of this description, not insolvent laws, are within the true spirit of the prohibition.

1819.

Sturges
v.
Crownin-
shi..ld.

The constitution does not grant to the States the power of passing bankrupt laws, or any other power; but finds them in possession of it, and may either prohibit its future exercise entirely, or restrain it so far as national policy may require. It has so far restrained it as to prohibit the passage of any law impairing the obligation of contracts. Although, then, the States may, until that power shall be exercised by Congress, pass laws concerning bankrupts; yet they cannot constitutionally introduce into such laws a clause which discharges the obligations the bankrupt has entered into. It is not admitted that, without this principle, an act cannot be a bankrupt law ; and if it were, that admission would not change the constitution, nor exempt such acts from its prohibitions.

Although the
States may, un-
til that power
is exercised by
Congress, pass
laws concern-
ing bankrupts,
yet they can-
not constitu-
tionally intro-
duce into such
laws a clause
which dis-
charges the
obligations the
bankrupt has
entered into.

The argument drawn from the omission in the constitution to prohibit the States from passing insolvent laws, admits of several satisfactory answers. It was not necessary, nor would it have been safe, had it even been the intention of the framers of the

constitution to prohibit the passage of all insolvent laws, to enumerate particular subjects to which the principle they intended to establish should apply. The principle was the inviolability of contracts. This principle was to be protected in whatsoever form it might be assailed. To what purpose enumerate the particular modes of violation which should be forbidden, when it was intended to forbid all ? Had an enumeration of all the laws which might violate contracts been attempted, the provision must have been less complete, and involved in more perplexity than it now is. The plain and simple declaration, that no State shall pass any law impairing the obligation of contracts, includes insolvent laws and all other laws, so far as they infringe the principle the Convention intended to hold sacred, and no farther.

*Distinction between a law impairing the obligation of contracts, and a law modifying the remedy given by the legislature to enforce the obligation.*

But a still more satisfactory answer to this argument is, that the Convention did not intend to prohibit the passage of all insolvent laws. To punish honest insolvency by imprisonment for life, and to make this a constitutional principle, would be an excess of inhumanity which will not readily be imputed to the illustrious patriots who framed our constitution, nor to the people who adopted it. The distinction between the obligation of a contract, and the remedy given by the legislature to enforce that obligation, has been taken at the bar, and exists in the nature of

*Imprisonment of the debtor is no part of the contract, and he may be released from imprisonment without impairing its obligation.*

things. Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct. Confinement of the debtor may be a punishment for not perform-

ing his contract, or may be allowed as a means of inducing him to perform it. But the State may refuse to inflict this punishment, or may withhold this means, and leave the contract in full force. Imprisonment is no part of the contract, and simply to release the prisoner does not impair its obligation. No argument can be fairly drawn from the 61st section of the act for establishing a uniform system of bankruptcy, which militates against this reasoning. That section declares, that the act shall not be construed to repeal or annul the laws of any State *then in force* for the relief of insolvent debtors, except so far as may respect persons and cases clearly within its purview ; and in such cases it affords its sanction to the relief given by the insolvent laws of the State, if the creditor of the prisoner shall not, within three months, proceed against him as a bankrupt.

The insertion of this section indicates an opinion in Congress, that insolvent laws might be considered as a branch of the bankrupt system, to be repealed or annulled by an act for establishing that system, although not within its purview. It was for that reason only that a provision against this construction could be necessary. The last member of the section adopts the provisions of the State laws so far as they apply to cases within the purview of the act.

This section certainly attempts no construction of the constitution, nor does it suppose any provision in the insolvent laws impairing the obligation of contracts. It leaves them to operate, so far as constitutionally they may, unaffected by the act of Con-

1819.

Sturges
v.
Crownin-
shield.

The 61st sec. of the act of Congress of 1800, c. 173. for establishing a uniform system of bankruptcy, does not confirm State insolvent laws, containing a provision impairing the obligation of contracts; but merely leaves them to operate, so far as constitutionally they may, unaffected by the act of Congress, except where that may apply to individual cases.

gress, except where that act may apply to individual cases,

The argument which has been pressed most earnestly at the bar, is, that although all legislative acts which discharge the obligation of a contract without performance, are within the very words of the constitution, yet an insolvent act, containing this principle, is not within its spirit, because such acts have been passed by Colonial and State Legislatures from the first settlement of the country, and because we know from the history of the times, that the mind of the Convention was directed to other laws which were fraudulent in their character, which enabled the debtor to escape from his obligation, and yet hold his property, not to this, which is beneficial in its operation.

Before discussing this argument, it may not be improper to premise that, although the spirit of an instrument, especially of a constitution, is to be respected not less than its letter, yet the spirit is to be collected chiefly from its words. It would be dangerous in the extreme to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation. Where words conflict with each other, where the different clauses of an instrument bear upon each other, and would be inconsistent unless the natural and common import of words be varied, construction becomes necessary, and a departure from the obvious meaning of words is justifiable. But if, in any case, the plain meaning of a provision, not contradicted by any other provision in the same in-

1819.

Sturges
v.
Crownin-
isheld.

strument, is to be disregarded, because we believe the framers of that instrument could not intend what they say, it must be one in which the absurdity and injustice of applying the provision to the case, would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application.

This is certainly not such a case. It is said the Colonial and State Legislatures have been in the habit of passing laws of this description for more than a century ; that they have never been the subject of complaint, and, consequently, could not be within the view of the general Convention.

The fact is too broadly stated. The insolvent laws of many, indeed, of by far the greater number of the States, do not contain this principle. They discharge the person of the debtor, but leave his obligation to pay in full force. To this the constitution is not opposed.

But, were it even true that this principle had been introduced generally into those laws, it would not justify our varying the construction of the section. Every State in the Union, both while a colony and after becoming independent, had been in the practice of issuing paper money ; yet this practice is in terms prohibited. If the long exercise of the power to emit bills of credit did not restrain the Convention from prohibiting its future exercise, neither can it be said that the long exercise of the power to impair the obligation of contracts, should prevent a similar prohibition. It is not admitted that the prohibition is more express in the one case than in the other. It does not indeed extend to insolvent laws by name,

The prohibi-
tion in the
constitution a-
gainst the
States making
any law im-
pairing the ob-
ligation of con-
tracts, does not
extend to pa-
per money or
tender laws,
because these
subjects are
expressly pro-
vided for; nor
is it to be li-
mited to instal-
ment or sus-
pension laws,
because the
terms of the
prohibition are
general and
comprehen-
sive, and esta-
blish the prin-
ciple of the in-
violability of
contracts in
every mode.

because it is not a law by name, but a principle which is to be forbidden; and this principle is described in as appropriate terms as our language affords.

Neither, as we conceive, will any admissible rule of construction justify us in limiting the prohibition under consideration, to the particular laws which have been described at the bar, and which furnished such cause for general alarm. What were those laws?

We are told they were such as grew out of the general distress following the war in which our independence was established. To relieve this distress, paper money was issued, worthless lands, and other property of no use to the creditor, were made a tender in payment of debts; and the time of payment, stipulated in the contract, was extended by law. These were the peculiar evils of the day. So much mischief was done, and so much more was apprehended, that general distrust prevailed, and all confidence between man and man was destroyed. To laws of this description therefore, it is said, the prohibition to pass laws impairing the obligation of contracts ought to be confined.

Let this argument be tried by the words of the section under consideration.

Was this general prohibition intended to prevent paper money? We are not allowed to say so, because it is expressly provided, that no State shall "emit bills of credit;" neither could these words be intended to restrain the States from enabling debtors to discharge their debts by the tender of property of no real value to the creditor, because for that subject also particular provision is made. Nothing but

gold and silver coin can be made a tender in payment of debts.

It remains to inquire, whether the prohibition under consideration could be intended for the single case of a law directing that judgements should be carried into execution by instalments?

This question will scarcely admit of discussion. If this was the only remaining mischief against which the constitution intended to provide, it would undoubtedly have been, like paper money and tender laws, expressly forbidden. At any rate, terms more directly applicable to the subject, more appropriately expressing the intention of the Convention, would have been used. It seems scarcely possible to suppose that the framers of the constitution, if intending to prohibit only laws authorizing the payment of debts by instalment, would have expressed that intention by saying "no State shall pass any law impairing the obligation of contracts." No men would so express such an intention. No men would use terms embracing a whole class of laws, for the purpose of designating a single individual of that class. No court can be justified in restricting such comprehensive words to a particular mischief to which no allusion is made.

The fair, and, we think, the necessary construction of the sentence, requires, that we should give these words their full and obvious meaning. A general dissatisfaction with that lax system of legislation which followed the war of our revolution undoubtedly directed the mind of the Convention to this subject. It is probable that laws such as those which

1819.

Sturges
v.
Crownin-
shield.
have been stated in argument, produced the loudest complaints, were most immediately felt. The attention of the Convention, therefore, was particularly directed to paper money, and to acts which enabled the debtor to discharge his debt, otherwise than was stipulated in the contract. Had nothing more been intended, nothing more would have been expressed. But, in the opinion of the Convention, much more remained to be done. The same miscief might be effected by other means. To restore public confidence completely, it was necessary not only to prohibit the use of particular means by which it might be effected, but to prohibit the use of any means by which the same mischief might be produced. The Convention appears to have intended to establish a great principle, that contracts should be inviolable. The constitution, therefore, declares, that no State shall pass " any law impairing the obligation of contracts."

If, as we think, it must be admitted that this intention might actuate the Convention; that it is not only consistent with, but is apparently manifested by, all that part of the section which respects this subject; that the words used are well adapted to the expression of it; that violence would be done to their plain meaning by understanding them in a more limited sense ; those rules of construction, which have been consecrated by the wisdom of ages, compel

*Statutes of limitation and usury laws, unless retroactive in their effect, do not impair the obligation of contracts.*

us to say, that these words prohibit the passage of any law discharging a contract without performance. By way of analogy, the statutes of limitations, and against usury, have been referred to in argument;

and it has been supposed that the construction of the constitution, which this opinion maintains, would apply to them also, and must therefore be too extensive to be correct.

We do not think so. Statutes of limitations relate to the remedies which are furnished in the courts. They rather establish, that certain circumstances shall amount to evidence that a contract has been performed, than dispense with its performance. If, in a State where six years may be pleaded in bar to an action of assumpsit, a law should pass declaring that contracts already in existence, not barred by the statute, should be construed to be within it, there could be little doubt of its unconstitutionality.

So with respect to the laws against usury. If the law be, that no person shall take more than six per centum per annum for the use of money, and that, if more be reserved, the contract shall be void, a contract made thereafter, reserving seven per cent., would have no obligation in its commencement; but if a law should declare that contracts already entered into, and reserving the legal interest, should be usurious and void, either in the whole or in part, it would impair the obligation of the contract, and would be clearly unconstitutional.

This opinion is confined to the case actually under consideration. It is confined to a case in which a creditor sues in a Court, the proceedings of which the legislature, whose act is pleaded, had not a right to control, and to a case where the creditor had not proceeded to execution against the body of his debtor, within the State whose law attempts to absolve a

This opinion confined to the case actually under consideration.

confined insolvent debtor from his obligation. When such a case arises, it will be considered.

It is the opinion of the Court, that the act of the State of New-York, which is pleaded by the defendant in this cause, so far as it attempts to discharge this defendant from the debt in the declaration mentioned, is contrary to the constitution of the United States, and that the plea is no bar to the action.

CERTIFICATE. This cause came on to be heard on the transcript of the record of the Circuit Court of the United States, for the first Circuit, and the district of Massachusetts, and on the questions on which the judges of that Court were divided in opinion, and was argued by counsel: On consideration whereof, this Court is of opinion, that, since the adoption of the constitution of the United States, a State has authority to pass a bankrupt law, provided such law does not impair the obligation of contracts, within the meaning of the constitution, and provided there be no act of Congress in force to establish a uniform system of bankruptcy, conflicting with such law.

This Court is farther of opinion, that the act of New-York, which is pleaded in this case, so far as it attempts to discharge the contract on which this suit was instituted, is a law impairing the obligation of contracts within the meaning of the constitution of the United States, and that the plea of the defendant is not a good and sufficient bar of the plaintiff's action.

All which is directed to be certified to the said Circuit Court.